871 A.2d 744

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICHARD A. WILLIAMS, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 9, 2005—Decided April 26, 2005.

Before Judges NEWMAN, AXELRAD and HOLSTON, JR.

*Ruth Bove Carlucci,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Bove Carlucci,* of counsel and on the brief).

*Linda K. Danielson,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General, attorney; *Ms. Danielson,* of counsel and on the brief).

The opinion of the court was delivered by

HOLSTON, Jr.

Defendant, Richard A. Williams, appeals his January 25, 2002 conviction and sentence for two counts of second-degree sexual assault contrary to *N.J.S.A.* 2C:14–2c(1). We reverse and remand.

On February 24, 1999, the Union County Grand Jury returned Indictment No. 99–02–0263 against defendant, charging him in counts one and two with second-degree sexual assault, contrary to *N.J.S.A.* 2C:14–2c(1), and counts three and four with fourth-degree criminal sexual contact, contrary to *N.J.S.A.* 2C:14–3b.

On May 3, 1999, defendant filed a motion to sever all four counts of the indictment and to proceed separately to trial on each count. On June 17, 1999, the judge agreed to sever only count four of the indictment, leaving counts one through three to be tried together in a single trial.

Trial was held before a judge and a jury on July 18, 19, 24, 25, 26, and 27, 2001. On July 27, 2001, the trial judge excused a deliberating juror and denied defendant's motion for a mistrial. That same day, the jury convicted defendant of sexual assault on counts one and two but acquitted defendant of fourth-degree criminal sexual contact on count three.

On December 7, 2001, defendant's motion for a new trial was heard and denied. On January 25, 2002, defendant was sentenced on counts one and two to consecutive seven-year terms of imprisonment on each of the second-degree sexual assault counts, to register as a sex offender pursuant to *N.J.S.A.* 2C:7–2 and *N.J.S.A.* 2C:7–3, and to community supervision for life pursuant to *N.J.S.A.* 2C:43–6.4. In addition, the appropriate fines and assessments were imposed. On December 18, 2002, defendant filed a notice of appeal.

Defendant is a certified massage therapist, who is alleged to have digitally penetrated the vagina of A.C. during the course of a massage on March 18, 1997. Defendant is also alleged to have digitally penetrated the vagina of R.I. on May 3, 1998.

A.C., also a certified massage therapist, was introduced to defendant in 1994. At the time, A.C. was a massage therapy student and both were employed at the same fitness center. When the fitness center closed, A.C. and defendant "traded" massages as a professional courtesy. Their relationship was

described as "casual," and the pair was never involved romantically. A.C. and defendant traded massages from 1995 to early 1997 two or three times without incident.

A.C. testified as follows: On March 18, 1997, defendant called A.C. telling her that he needed a massage and that he would perform a massage on her. A.C. agreed and went to defendant's home where his office was located in the basement. Defendant's wife was home at the time. After conversing with defendant's wife, A.C. went downstairs to the basement. A.C. told defendant that she preferred to perform the first massage and receive her massage second. Defendant then removed his shirt and began to undo his pants. A.C. was surprised by defendant's conduct because he usually waited for her to leave before disrobing. A.C. left the room so defendant could finish disrobing and positioned himself on the table under the sheet. A.C. then gave defendant a massage.

After completing defendant's massage, A.C. left the room so that he could dress. When she returned, defendant remained in the room. After prompting him to leave so that she could get undressed, defendant left. Defendant had never remained in the room while she had disrobed on previous occasions. A.C. undressed and laid down on the massage table. For the first part of the massage, while she was on her back, nothing unusual occurred.

For the second part of her massage, A.C. was lying on her stomach. While in this position, A.C. alleged that defendant performed an unusual move by using his left hand on her inner thigh and positioning his right hand on her lower back. Usually, both hands would be used to work on the leg. Defendant moved his hand further and further up A.C.'s thigh and penetrated her vagina with his fingers.

A.C. reacted immediately. She jumped off the table and looked at defendant saying: "Rick, what the fuck do you think you're doing?" A.C. alleged that defendant could not look at her and just looked at the floor and responded, "I was just rubbing your lower back." In shock, A.C. laid back down on the table for twenty or

thirty seconds, and defendant did some "finishing touches." Defendant left the room when he was finished and returned after A.C. had dressed.

Upon leaving defendant's home, A.C. sat in her car for a while and then went to her mother's house, arriving at 11:30 p.m. A.C.'s mother was sleeping, and her father was not home. The next evening, A.C. reported the incident to her mother. A.C.'s mother dissuaded A.C. from reporting the incident to the police, believing it would be too traumatic for her.

In 1997, R.I. was forty-seven years of age and suffered from rheumatoid arthritis. She testified that an acquaintance recommended that she try massage therapy with defendant for her condition. When R.I. contacted defendant, he told her that he worked at two locations and that one of his offices was in his home in Scotch Plains.

When R.I. arrived for the first massage, she met defendant's wife and son. R.I. completed the necessary health forms. Defendant told her that it was optional if she wanted to keep on her underwear. R.I. opted to be nude. Defendant left while R.I. undressed and positioned herself on the table. Nothing inappropriate occurred. Additionally, R.I. indicated that she could immediately feel the benefits. Over the next nine months, defendant gave R.I. ten to twelve massages. However, R.I. had to stop due to her financial situation. R.I. informed defendant that she would contact him when her financial situation improved.

On May 3, 1998, defendant contacted R.I. to offer her a free massage because she was a loyal customer, despite the fact that her financial situation had worsened. R.I. agreed and arrived at defendant's home that afternoon. No one else was home. The massage was routine and appropriate for the first half when R.I. was on her back.

When R.I. flipped over onto her stomach, defendant began performing "deep pressure" on her back with his forearm. She was facedown in the headrest and could not move. Defendant told

R.I. that he was going to apply more pressure. He placed his knee on the table for more leverage—something he had never done before. Defendant then straddled her on the table with his knees at her thighs. Defendant's hand then brushed against her vaginal area. At first, R.I. assumed that it was accidental. However, defendant continued to use his forearm to hold her still and leaned into her, inserting his fingers into her vagina and emitted a "moaning sound."

Defendant asked, "How does this feel?" R.I. could not speak or respond. Then defendant stopped. R.I. sat up on the table. Defendant began to converse with her in a "monotone, almost ominous kind of voice." Defendant told her that she could come over anytime for a massage. Because defendant would not leave the room, R.I. felt compelled to dress in front of him. R.I. went up the stairs and walked quickly out the front door.

R.I. got into her car and cried. She drove around the corner and "collapsed" for several minutes. She subsequently drove to her parents' home to pick up her daughter. However, she did not report the incident to either her mother or her father. Nor did she tell her husband when she returned home later that night because she was having marital problems.

The next morning, R.I. was working out at the gym. Her friend, Eddie Currie (Currie), observed that R.I. was not her usual self. R.I. and Currie were both very good friends, but they were not romantically involved. The two went to Currie's apartment where she told him that defendant sexually assaulted her. Currie suggested that she report the assault to the police and seek counseling. On May 5, 1998, the next day, R.I. visited the rape crisis center. On May 18, 1998, R.I. reported the sexual assault to the police.[1]

---

[1] Sometime during the Memorial Day weekend in 1998, A.C.'s mother read an article in the Star–Ledger about defendant and showed it to A.C. Despite A.C.'s mother's attempt to dissuade A.C. from coming forward, as a result of the

At trial, K.T. also testified to defendant's alleged sexual misconduct during the course of her massage. She indicated that she received monthly massages from defendant. She testified that while she was lying on her stomach with her palms up, defendant rested his penis in her hand. She did not say anything to him because she at first thought the act was accidental. When K.T. received her last massage from defendant in November 1996, defendant placed his erect penis in her hand while she was on her stomach with her palms up. Additionally, while he was massaging her leg, his thumb pressed against her vagina over her underwear. K.T. went to the prosecutor's office after she saw the newspaper article. She provided a statement to police in February 1999.

Defendant presented nine character witnesses on his behalf. All of the witnesses testified that defendant was honest and law-abiding.[2] Defendant also testified on his own behalf. He denied any wrongdoing. He testified as to his qualifications and experience as a massage therapist. Defendant testified that he contacted A.C. because his back hurt. He also indicated that he did not consider disrobing in front of another massage therapist to be an issue since, as massage therapists, they both see bodies all of the time. Defendant claimed that his offer of a free massage to R.I. was based on a business and marketing decision, not an excuse to get R.I. over to his home. As for K.T., defendant noted that she bought gift certificates from him in December 1996 and had referred a client to him, whom he massaged in February 1998. Defendant also stated that the accusations adversely affected his massage therapy business, tarnished his reputation in the community and caused his wife to be hospitalized for thirteen weeks.

On July 17, 2001, the jury convicted defendant of counts one and two (second-degree sexual assault) and acquitted him of count

---

newspaper article, A.C. also came forward and reported her alleged sexual assault by defendant in July 1998.

[2] Defense witnesses included fellow massage therapist colleagues, clients, and defendant's pastor.

three (fourth-degree criminal sexual contact).[3]

Defendant presents the following arguments for our consideration:

\* \* \* \* \*

[At the direction of the court, per *Rule* 1:36–3, the discussion of POINT I and POINT IV in the appeal are omitted from the published version of the opinion.]

\* \* \* \* \*

POINT II
BECAUSE THE JUROR WHO WAS EXCUSED AT A CRITICAL POINT IN DELIBERATIONS WAS NEITHER ILL NOR UNABLE TO CONTINUE, HIS REMOVAL AND REPLACEMENT WITH AN ALTERNATE JUROR VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL BY AN IMPARTIAL JURY. *U.S. CONST.* AMENDS. VI, XIV; *N.J. CONST.* (1947) ART. I, PARS. 1, 9, 10.

POINT III
THE COURT'S FRESH COMPLAINT INSTRUCTION TO THE JURY WAS ERRONEOUS, THEREBY DENYING DEFENDANT A FAIR TRIAL AND DUE PROCESS OF LAW. *U.S. CONST.* AMENDS. VI AND XIV; *N.J. CONST.* (1947) ART. I, PAR. 10.

\* \* \* \* \*

## II

Defendant argues that the trial court erred by removing Juror Number 4 and substituting an alternative juror rather than declaring a mistrial. Defendant contends that the record does not demonstrate that the juror was unable to continue deliberating but, instead, that Juror Number 4 was not convinced beyond a reasonable doubt as to defendant's guilt. Defendant asserts that the evidence demonstrates that his position differed from the rest of the jury. In support of this contention, defendant notes (1) the length of deliberations to that point (approximately twelve hours); (2) the focus on the testimony of R.I. and "fresh complaint" witness, Currie, by the jury's request for a read-back of both

---

[3] Count four was dismissed by the State.

witnesses' testimony; (3) the jury's request for a copy of the court's instructions as to how to arrive at a judgment and the evidence that may be considered; and (4) the trial court's decision to read the "modified *Allen* charge" as part of the court's response to the jury's request.[4] Defendant notes that once Juror Number 4 was removed and replaced with an alternate, a verdict was reached fifty-nine minutes thereafter. Defendant asserts that a mistrial should have been granted because the jury was essentially deadlocked. Defendant contends that the trial judge's decision to remove Juror Number 4 and substitute an alternate juror rather than grant defendant's motion for a mistrial constitutes reversible error.

## A. Removal of the Juror.

*Rule* 1:8–2(d)(1) governs the removal and substitution of deliberating jurors and provides, in pertinent part:

> If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

Our Supreme Court has noted that "[t]he *Rule* attempts to strike a balance between the need for judicial economy, especially in the context of lengthy trials, and the fundamental right of defendants to a fair trial by jury." *State v. Valenzuela,* 136 *N.J.* 458, 467, 643 *A.*2d 582 (1994). The Court cautioned that,

> The *Rule*, however, is to be employed sparingly. "[T]he potential prejudicial impact upon the integrity of the jury deliberation process would mandate that the rule be invoked only as a last resort mechanism to avoid the deplorable waste of time, effort and money inherent in a mistrial." *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.*2d 555 (App.Div.1978).
>
> . . . .

---

[4] The "modified *Allen* charge" refers to a charge recommended for use by the Supreme Court in *State v. Czachor,* 82 *N.J.* 392, 413 A.2d 593 (1980), when jurors are unable to reach a unanimous verdict in a criminal case.

A trial court cannot discharge a juror merely because that juror is one "whose position is at odds with the rest of the jury." *State v. Paige*, 256 *N.J.Super.* 362, 380–81, 607 *A*.2d 164 (App.Div.), *certif. denied,* 130 *N.J.* 17, 611 *A*.2d 655 (1992). [*Valenzuela, supra,* 136 *N.J.* at 468–69, 643 *A*.2d 582 (citations omitted).]

In *Valenzuela,* while deliberating, the jury sent a note out to the trial judge advising that one juror did not wish to continue deliberating. *Id.* at 462, 643 *A*.2d 582. When questioned by the judge, the reluctant juror complained "they all are ganging up on me now[,]" and she no longer wished to serve as a juror on the case. *Id.* at 462–63, 643 *A*.2d 582. Initially, the trial judge determined there was insufficient information to warrant removal of the juror, and "instructed the jury to return to the jury room, to discuss the case, and to apply the law to the facts in an effort to reach a decision." *Id.* at 464, 643 *A*.2d 582. Within half an hour, a second note was received from the jury that read:

Juror Number 9 does not understand the process. She changes her plea every 10 seconds. She wants to vote however we want to vote, but she is very confused. We have stressed that she must vote the way she believes. We request an alternate juror, as it is felt that Juror Number 9 is not capable of expressing herself.
[*Ibid.*]

Upon additional questioning by the judge, Juror Number 9 responded she did not think she would be able to decide the case with the other jurors because "everybody else has a different opinion[.]" *Id.* at 465, 643 *A*.2d 582. In deciding to remove Juror Number 9, the trial judge found "she's not functional in what she's doing there[,]" and he had "heard her talking to herself." *Id.* at 466, 643 *A*.2d 582. The judge concluded that the juror was "somewhat bizarre[,]" and did not think "that she's able and functional to know what she's doing to discuss the case intelligently and to do her function and her job." *Ibid.*

In determining that the trial judge improperly dismissed Juror No. 9, the *Valenzuela* Court stated:

The court dismissed the juror despite her statements that she understood her function, that she was willing to abide by her oath, and that she was willing and able to apply the law. . . .

The record also contains evidence that the circumstances leading to the jury's and the juror's desire for discharge may have stemmed from interactions in the jury

room. Many of the juror's responses to the court's questioning indicate that she held a different position from that of the other jurors.

. . . .

Thus, *we hold that a juror cannot be discharged as "unable to continue" unless the record adequately establishes that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members. If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations. If the jury remains unable to return a verdict, the court should determine whether further deliberation would allow the jury to reach a verdict. If the jury indicates intractable deadlock, the court should declare a mistrial.*

[*Id.* at 471–73, 643 *A.*2d 582 (quoting *State v. Trent,* 157 *N.J.Super.* 231, 240, 384 *A.*2d 888 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.*2d 1271 (1979))(emphasis added).]

More recently, in *State v. Hightower,* 146 *N.J.* 239, 248, 680 *A.*2d 649 (1996), involving a capital murder prosecution, during the seven-day penalty trial, after approximately six and one-half hours of deliberating over a two-day period, the jury submitted the following note:

[I]t has come to our attention that one of the jurors has information and knowledge about this case beyond the scope of the evidence given in Court. We ask your direction in regard to this matter.

The trial judge then suspended the jury's deliberations and interviewed each juror individually. It was disclosed that Juror Number 7 had informed the jury that he had heard, while shopping in a store earlier in the week, that the victim had three children. *Id.* at 249, 680 *A.*2d 649. Additionally, during the interviews of the jurors, it was disclosed that Juror Number 7 was taking a different position than the other jurors. *Ibid.* Interviews with some of the jurors also revealed that Juror Number 7 may have failed to disclose on his jury questionnaire "that he opposed the death penalty and that he had visited prisons in the past." *Id.* at 250, 680 *A.*2d 649. The trial judge rejected defense counsel's request for a mistrial and ordered that Juror Number 7 be removed from the jury and replaced with an alternate. *Ibid.* Thereafter, the jury resumed deliberations anew and returned a verdict of death. *Id.* at 251, 680 *A.*2d 649.

In rejecting the trial court's application of the inability-to-serve criteria contained in *Rule* 1:8–2(d), the *Hightower* Court stated:

> Thus, *the inability-to-continue standard may not be invoked to remove a deliberating juror when the record merely reveals that the juror has a position that is different from that of other jurors. Nor may the standard be employed to remove a deliberating juror where the record reveals that the juror's problems are related to both personal circumstances and factors arising from the juror's interactions with other jurors.* In other words, *the reason must be exclusively personal.*

[*Id.* at 255, 680 A.2d 649 (citations omitted) (emphasis added).]

Recently, our Supreme Court addressed this situation is *State v. Jenkins*, 182 *N.J.* 112, 861 A.2d 827 (2004). There, the Supreme Court held that "a deliberating juror who expressly states that she will not obey her oath and follow the law, as instructed by the court, is unable to continue serving as a juror and may be substituted with an alternate juror under *Rule* 1:8–2(d)(1)." *Id.* at 137, 861 A.2d 827. In that case, the defendant was charged as a juvenile for attempting to rob a store brandishing a kitchen knife. Unlike the juror in *Valenzuela,* the juror in *Jenkins* did not feel pressured by other members of the jury. *Id.* at 128, 861 A.2d 827. Rather, the juror requested to see the judge after the jury was charged and began deliberating. *Id.* at 119, 861 A.2d 827. The juror told the judge and counsel that as a "black woman" with children the defendant's age, she could not make a decision to convict the defendant and send him to jail. *Id.* at 127, 861 A.2d 827. The juror also expressly admitted that she could not decide the case based on the evidence fairly, impartially, and without sympathy. *Id.* at 128, 861 A.2d 827. The colloquy with the judge made it evident that the juror was not willing to follow the law. *Ibid.* In rendering its decision, the Court explained:

> A juror who would decide a case based solely on a defendant's race violates her oath. *A juror who would decide a case based solely on a personal identification* or revulsion with a defendant, without regard to the evidence, also *violates her oath. A juror,* as in this case, *who announces that she cannot obey her oath, follow the law, and render fair and impartial justice cannot remain on the jury.* To rule otherwise would be to yield to a notion that is anathema to our scheme of justice—that a juror, judging the fate of a defendant, can be a law unto herself.

[*Ibid.* (emphasis added).]

In this case, the following colloquy took place between Juror Number 4 and the judge with counsel present:

JUROR: Well, I'm going to ask to be excused. It came up during the—I think [defendant's] testimony or one of the references' testimony that he is a Free Mason. And I thought, boy. I agonized over it a couple of days. I'm finding myself in a position now where that's affecting my judgment as far as this case is concerned.

My indoctrination in Free Mason comes with certain loyalties to other Free Masons. And I'm finding it very difficult now to make a decision one way or the other as to how I would vote. It's a serious conflict for me.

THE COURT: I take it you are yourself a Free Mason.

JUROR: I am.

THE COURT: Through the testimony that was presented in court you learned of [defendant].

JUROR: I think one of the references may have said something to it, but he reiterated and I didn't really—I thought I could go with my gut feeling of being very clear and making a definitive decision and that not having no affect on me. But now I see it's affected my judgment in terms of voting yes or no.

Now, there's something we talk about in Free Mason is helping a worthy brother. Here's a guy who's been worthy. So many people came forward and said he is a good guy. Then there are other contradictory type testimony that puts me at a dilemma. And that's my dilemma at this juncture.

THE COURT: To some extent the dilemma that you mentioned is the same that is faced by every juror. They hear what is contradictory information, it's somebody said one thing, somebody says something else. There's no way to reconcile often in a case generally that both of those things can be true at the same time and part of the role of jurors is to make judgments, to be finders of facts and to attempt to reconcile what appears to them to be completely contradictory, completely inconsistent information. That's why many of the instructions that are given to jurors deal with assessing people's credibility, making determinations as to who jurors are inclined to be considered credible, believable or not believable and attempt to come to a determination as to what the facts in the case are using to some extent common sense, to some extent assessments you make of people as you watch them testify, listen to what they say, listen to how they say it. What I'm getting at is that that process of trying to reconcile inconsistent things is part of what everybody on every jury pretty much has to do.

JUROR: Yes, I understand.

THE COURT: You seem to be telling me that you're in a situation that's sort of different or beyond that.

JUROR: *Because of my Masonic principles I cannot find this brother, as a Free Mason, guilty.* That's the dilemma it [got] me in.

THE COURT: And it is because of your membership in the organization?

JUROR: *Because of my oath as a Free Mason.*

THE COURT: That simply prohibits you from rendering a verdict in the case?

JUROR: That that puts me at a dilemma in this situation and that's why I would ask to be excused, because it wouldn't be fair to the Prosecutor and it wouldn't be fair to the defense either. So that's the dilemma for me based on those principles that I guide my life by. It didn't come up until like later on in the proceedings. I mean I was on a roll, I'm ready to do all of this work and, you know, off for the entire summer. Then that hits me and that's where it became a controversy for me. Because all of the other work and stuff it was no big deal, but this is what has grown to this point where I'm saying I need to talk to you about it. I have difficulty with this. And that's why I'm asking to be excused, based upon those principles that I live my life by and my organization principles and principles that govern the law. That's why I'm coming to you.

THE COURT: *Is there any way that your adherence, your belief in your organizational principles will allow you to simply view the evidence in the case and make a judgment, make a decision in the case without taking into consideration the information that you know about [defendant] and his participation as a Free Mason?*

JUROR: *I don't think so.* That's my dilemma right there.

THE COURT: *That fact that you are aware of now that [defendant] is a Free Mason, that is not something that you can put aside, that you can keep out of your mind and make your decision independent of that information, independent of that information?*

JUROR: *No, sir.*

[ (emphasis added).]

Upon questioning by the assistant prosecutor, Juror Number 4 indicated that he had an oath of loyalty to worthy fellow members, stating: "After seeing a parade of witnesses, I feel he's very worthy and after viewing the other evidence, it came to be a conflict for me and that's where I'm having difficulty here." Thereafter, defense counsel and Juror Number 4 had the following exchange:

[DEFENSE COUNSEL]: [Juror Number 4], you've deliberated with the other jurors for a day and a half, sir, and you had this conflict because of your belief system.

JUROR: Yes, I thought I could work through it *but I'm to the point where it comes to a head and I need to talk to the Judge about this.*

[DEFENSE COUNSEL]: I assume, [Juror Number 4], even though you felt this conflict you continued to vote towards a verdict with [the] other jurors?

JUROR: I continued to work with them, yes.

[ (emphasis added).]

In applying the preceding legal principles to the facts of this case, it is clear that Juror Number 4's removal was proper.

Juror Number 4 was removed after he brought to the court's attention the fact that he, like defendant, is a "worthy" Free Mason. He informed the judge that he had difficulty reconciling the evidence as per the court's instruction because he deemed defendant to be a "worthy" Free Mason, for whom, he felt a duty of loyalty. It is this contradiction that Juror Number 4 raised (duty of loyalty to a fellow worthy Free Mason versus duty to follow all of the evidence pursuant to the law), which ultimately resulted in his removal.

This case is factually different from *Valenzuela*. The trial judge found that Juror Number 4's conflict was exclusively *personal* rather than a conflict with other members of the jury. There is no evidence that the other members of the jury were "ganging up" on him or that, as defendant suggests, he remained the lone holdout. Such a position is mere speculation. Juror Number 4 was subject to questioning by the trial judge and counsel for both parties. He indicated that his personal conflict was not made known to the other jurors and wished it to remain that way. The facts here are more analogous to that of *Jenkins* because the basis of the removal there was based on racial identification. Here it is based on fraternal oath identification. Therefore, the court properly found that Juror Number 4 could no longer continue in the deliberative process as a result of his exclusive personal, fraternal oath conflicts.

In deciding to remove Juror Number 4, the judge stated:

First of all, with respect to the request by [Juror Number 4] that he be relieved as a juror, it is my decision that request must be granted. [Juror Number 4] has brought to the Court's attention his *personal problem*. His problem that as a member of Free Masons the fact [that he] has taken an oath of loyalty to that organization and to its members, that *he is not able to objectively reach a decision in the case, that his sense of loyalty based upon the principles of the organization to which he belongs overrides his ability to make an independent determination based on the evidence presented to him. I think that was evident through his statements and his response to questions in camera today.* He therefore must be removed.

*This is, I believe, a situation where the reason for the removal is personal to the juror.* It is a problem that he has that prevents him from continuing as a member

of the jury.... *This is a personal matter to the [juror], a question to [Juror Number 4] and it necessitates his removal.*
[ (emphasis added).]

Clearly, the record demonstrates that Juror Number 4's removal was necessary and proper. Juror Number 4's "dilemma" had nothing to do with jury interaction. The problem was exclusively personal to the juror. The juror was unable to follow the law charged by the court because of the Free Mason principles to which he loyally adhered. In these circumstances, the trial judge did not abuse his discretion in discharging Juror Number 4.

### B. Failure to Declare a Mistrial.

Under the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution "the right of a defendant to be tried by an impartial jury is of exceptional significance." *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983). The securing and preservation of an impartial jury goes to the very essence of a fair trial. *Sheppard v. Maxwell,* 384 *U.S.* 333, 362, 86 *S.Ct.* 1507, 1522, 16 *L.Ed.*2d 600, 620 (1966).

On the fifth day of defendant's trial, the jurors heard the judge's instructions and then began deliberations at 10:05 a.m. The first two questions asked by the jury were read into the record at 10:19 a.m.: (1) They asked to see the videotape defendant presented as part of his case in which he demonstrated a typical sports massage; and (2) "What are the actual dimensions of the tables used?"

The next questions were read into the record at 11:37 a.m.: (1) "Is it possible to see Eddie Currie's testimony prior to this case and to include this as consideration?" (2) "Do we know the exact date [R.I.] went to [the] rape crisis center?" At 4:25 p.m., the jury requested that it be dismissed for the day. At 10:40 the following morning, the jury asked for a read-back of the testimony of R.I. and for a written transcript of the trial. The jury also asked for "a copy of the Court's instructions specifically regarding what or how to arrive at an appropriate judgment and what can be considered evidence then your rules, printed test." It was at this juncture that the trial court decided to read "the so-called modi-

fied *Allen* charge as to how it is they are to consider evidence and see if that is helpful to them in response to this question."

At 1:48 p.m., Juror Number 4 indicated that he wished to address the court. Juror Number 4 assured the trial court that he had not shared his dilemma with the rest of the jury: "Nobody knows anything about my personal life as a Free Mason and I didn't mention anything and I hope that it is kept confidential." Based upon this information, the trial court concluded that the juror's request to be excused should be granted since he "could not continue as a juror in this case," noting "I don't think counsel has any disagreement with that." Defense counsel was careful to qualify the court's remarks: "Just for the record, as to the decision of [Juror Number 4], I will just submit to your discretion rather than consent to anything." Defense counsel did not acquiesce to the substitution of an alternate juror, but argued that because Juror Number 4's request and ultimate excusal came after nearly twelve hours of deliberations, the process had become irreparably tainted and, thus, a mistrial was required. The trial court denied defendant's mistrial motion and, instead, substituted an alternate juror and gave the reconstituted jury instructions to begin its deliberations anew.

The reconstituted jury began its deliberations at 3:05 p.m. and posed a question at 4:03 p.m., asking for clarification of the term "physical force." After being reinstructed, the jury retired to continue deliberations at 4:15 p.m. and delivered a verdict one minute later at 4:16 p.m.

In *Hightower*, the Supreme Court stated:

Clearly, *frequent reconstitution of deliberating juries could destroy the integrity and the mutuality of deliberations, thereby depriving defendants of the right to a fair trial by an impartial jury.* The "mutuality of deliberations" is at the core of jury deliberations. It entails the joint or collective exchange of ideas among individual jurors that remains intact until a final determination is reached. Mutuality may be destroyed if juror substitution is not made in accordance with the limited scope of the rule for removal. . . .

Because juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, *it should be invoked only as a last resort to avoid*

*the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial.*

[*Hightower, supra,* 146 *N.J.* at 253–54, 680 *A.*2d 649 (citation omitted) (emphasis added).]

Most recently, in *Jenkins,* the Court held that the trial court erred when it replaced a discharged juror with an alternate rather than declare a mistrial, because the jury's deliberations had advanced so far that the newly reconstituted jury would not have been able to consider the defendant's guilt or innocence anew. *Jenkins, supra,* 182 *N.J.* at 131, 861 *A.*2d 827. After deciding to remove the juror, the trial court permitted deliberations to continue with an alternate juror rather than declare a mistrial. *Id.* at 123, 861 *A.*2d 827. The trial court then recharged the reconstituted jury to begin deliberations anew. *Ibid.* Twenty-three minutes later, the jury convicted defendant. *Ibid.*

The Court observed that "there are times when jury deliberations have proceeded too far to permit replacement of a deliberating juror with an alternate." *Id.* at 131, 861 *A.*2d 827. Reconstituting a jury with an alternate juror during the deliberative process " 'can destroy the mutuality of the jury's deliberations,' and 'impose precisely the kind of extraneous influence upon the deliberative process that this Court has forbidden.' " *Id.* at 132, 861 *A.*2d 827 (quoting *State v. Corsaro,* 107 *N.J.* 339, 349, 526 *A.*2d 1046 (1987)). If deliberations proceed for a period of time and to an extent where it is highly likely that the jury has already made a decision as to guilt or innocence, the role of the new juror in the deliberations may be inconsequential. *Ibid.* (citing *Corsaro, supra,* 107 *N.J.* at 352, 526 *A.*2d 1046).

Thus, " '[t]he longer the period of time the jury deliberates, the greater is the possibility of prejudice should a juror be substituted or replaced.' " *Ibid.* (quoting *State v. Miller,* 76 *N.J.* 392, 407, 388 *A.*2d 218 (1978)). "However, '[t]he concern in determining whether substitution can take place at a given point in the deliberations is not merely the length of time that the jury has deliberated but the effect that the progress in deliberations will have on the reconstituted jury's ability truly to begin deliberations anew.' "

*Ibid.* (quoting *Valenzuela, supra,* 136 *N.J.* at 474–75, 643 *A.*2d 582). The Court found the fact that the newly reconstituted jury returned a verdict in twenty-three minutes was evidence "that minds were closed when the alternate joined the deliberations." *Id.* at 133, 861 *A.*2d 827. The other jurors were prepared to convict the defendant. *Id.* at 132, 861 *A.*2d 827. It was unlikely that the original jurors would have been able to begin deliberations anew or that the alternate juror would not have felt pressured to agree with them. *Id.* at 133, 861 *A.*2d 827.

New Jersey is not alone in evaluating the overall effect that substituting an alternate juror during deliberations rather than declaring a mistrial will have on the jury's ability to begin deliberations anew. For example, in *United States v. Virgen–Moreno,* 265 *F.*3d 276, 289 (5th Cir.2001), *cert. denied,* 534 *U.S.* 1095, 122 *S.Ct.* 843, 151 *L.Ed.*2d 721 (2002), the Fifth Circuit set forth a number of factors, among others, to determine whether a late substitution of an alternate prejudiced the defendant:

(1) *the length of the jury's deliberations before and after the substitution;*

(2) the … court's instruction to the alternate juror prior to dismissing [him or] her and thereafter, prior to impaneling [him or] her; (3) the alternate juror's exposure to the outside influences; and

(4) the … court's instructions to the jury upon the substitution to begin its deliberations anew.

[ (emphasis added).]

Likewise, in *People v. Roberts,* 214 *Ill.*2d 106, 124, 291 *Ill.Dec.* 674, 684, 824 *N.E.*2d 250, 260 (2005), the Illinois Supreme Court set forth factors to be considered in determining whether a defendant was prejudiced by a juror substitution after deliberations had commenced:

(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case;

(2) *whether the original jurors had formed opinions about the case in the absence of the alternate juror;*

(3) whether the reconstituted jury was instructed to begin deliberations anew;

(4) whether there is any indication that the jury failed to follow the court's instructions; and

(5) *the length of deliberations both before and after the substitution.*

[ (emphasis added).]

In evaluating the totality of the circumstances here, the jury had been deliberating for approximately twelve hours before Juror Number 4 asked to be removed. When the alternate was impaneled and the jury was reconstituted, it took less than an hour for the jury to convict defendant of two counts of sexual assault because, during that period, the jury asked the court for clarification on the definition of "physical force." Thus, the length of the deliberations was substantially longer prior to the removal and substitution of Juror Number 4 than afterwards. In addition, the jury's request and the timing of the request for a read-back of Currie's fresh complaint testimony and for a read-back of R.I.'s testimony, the court's subsequent recharge on how to arrive at a judgment and what constitutes evidence, and an apparent sua sponte *Czachor* charge, demonstrate that the jury was thoroughly engaged in deliberating on whether the State had carried its burden of proof of defendant's guilt. The jury continued its deliberations during the colloquy between the court and Juror Number 4. Once the alternate was substituted for Juror Number 4, the jury was well-entrenched in the deliberations.

Given the totality of the circumstances here, it is highly doubtful that the jury could have been expected to begin its deliberations anew as opposed to the deliberating jurors simply informing the substituted juror of their respective positions based on their twelve hours of deliberations and then continuing deliberations from that point. The fact that the verdict was arrived at fifty-nine minutes later corroborates the unrealistic expectation that the jury was capable at that point in time to start deliberations anew. The decision had already been made at defendant's expense with little or no input from the alternate juror.

*Jenkins* is controlling, and a mistrial should have been declared. Because the improper substitution of the juror had the clear potential to infringe upon defendant's fundamental right to a fair trial by an impartial jury of twelve, defendant's convictions must be reversed.

### III

 Under the fresh complaint rule, "the victim's statements to someone she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." *State v. Hill*, 121 *N.J.* 150, 163, 578 *A.2d* 370 (1990)(citing *State v. Tirone*, 64 *N.J.* 222, 226–27, 314 *A.2d* 601 (1974)). "The purpose of the fresh-complaint rule is to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime." *State v. Bethune*, 121 *N.J.* 137, 146, 578 *A.2d* 364 (1990).

 As for charging the jury, the Supreme Court's guidance as set forth in *Bethune* is particularly helpful. The charge should inform the jury that the sole purpose of fresh complaint evidence is to counter any inference that might be drawn that the alleged victim's behavior was inconsistent with a claim of sexual abuse. *Id.* at 147–48, 578 *A.2d* 364. The Court further explained:

Trial courts should instruct the jury of the limited role that fresh-complaint evidence should play in its consideration of the case. *The trial court should make clear that a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent.*

[*Id.* at 148, 578 *A.2d* 364 (emphasis added).]

Additionally, the *Bethune* Court noted the defendant's reliance in that case on *State v. J.S.*, 222 *N.J.Super.* 247, 536 *A.2d* 769 (App.Div.), *certif. denied*, 111 *N.J.* 588, 546 *A.2d* 513 (1988). In *J.S.*, the trial court made "a passing reference in its charge to the former practice of admitting 'fresh complaint' evidence in order to bolster the victim's credibility." *Bethune, supra,* 121 *N.J.* at 147, 578 *A.2d* 364 (citing *J.S., supra,* 222 *N.J.Super.* at 257, 536 *A.2d* 769). This court rejected making such a reference. *J.S., supra,* 222 *N.J.Super.* at 257, 536 *A.2d* 769 ("Reference to the complaint as "supporting" or "bolstering" [the victim's] credibility should not be made."). The Supreme Court agreed that the trial court should not have made any reference to "bolstering" the credibility of the victim. *Bethune, supra,* 121 *N.J.* at 149, 578 *A.2d* 364. However, it concluded that doing so was harmless in that case

given the trial court's instructions regarding the limited purpose of the fresh-complaint rule and the fact that the defendant failed to object to the jury charge. *Id.* 148–49, 578 *A.*2d 364. Moreover, this court in *State v. Buscham,* 360 *N.J.Super.* 346, 359, 823 *A.*2d 71 (App.Div.2003), set forth the proposition that a failure to give a proper limiting instruction on the use of fresh complaint testimony would result in the possibility of substantial prejudice and, therefore, require a new trial.

Where, as here, there has been no objection to the court's charge, reversal is proper only if there was *plain error* or the error was of such a nature as to have been *clearly capable* of producing an unjust result. *R.* 2:10–2 (emphasis added).

The judge provided the following charge on the fresh complaint evidence:

> The law recognizes that it would be natural for you to assume that a person subjected to unlawful sexual acts would complain within a reasonable time to someone who she would ordinarily turn to for sympathy, protection or advice. If you heard no evidence that a person made such a complaint, you might conclude that no unlawful sexual act occurred. As a result, in cases involving allegations of sexual abuse the State is permitted to introduce evidence that some complaint was made.... *The only reason that the evidence is permitted is to prevent you from making a false assumption about whether or not the complaint was made. ... It is for this limited purpose that the State was permitted to introduce the testimony that [R.I.] made a complaint to James [sic] Currie and that [A.C.] made a complaint to [C.C.].*

At the end of the charge, the judge restated that "[p]roof that a complaint was made is neither proof the sexual act occurred nor proof that the victim was truthful." However, the judge then stated:

> If you should find a complaint was made within a reasonable time to one whom [R.I.] or [A.C.] would confide in, you may consider that fact and all the circumstances relating to the complaint *in evaluating her credibility as a witness.* [ (emphasis added).]

Thus, it is these two contradictory charges that the court gave that defendant contends constitutes reversible error. In reviewing the fresh complaint charge, we note that the charge instructs the jury as to the different evidence that the jury may consider such as whether a complaint was in fact made, its timeliness, the

conduct and demeanor of the person making the complaint, whether the complaint was volunteered, and what weight should be accorded each fact found. However, the last sentence of the fresh complaint charge referencing an evaluation of the credibility of the witness essentially taints the overall charge, thereby, confusing the purpose for which the fresh complaint testimony may be used. The last sentence of the fresh complaint charge here told the jury that the fresh complaint could be used by them in evaluating the victims' credibility. The jury could have focused its attention, therefore, on that particular part of the court's instruction. This is particularly true since the jury specifically asked for the read-back of fresh complaint witness Currie's testimony and that of R.I. Additionally, the jury asked for further instruction on what can be considered evidence. In his response, the court told the jury "to consider evidence for only those purposes for which it has been admitted."

It is evident from the record that the jury was deeply concerned about the fresh complaint testimony because the jury requested the read-back of Currie's testimony and guidance as to how to arrive at a judgment. The difficulty in resolving the issue may well have been the result of confusion derived from the conflicting jury charges on the use of fresh complaint evidence. In fact, the jury apparently wrestled with this issue the entire morning on its second day of deliberations. Thus, we are convinced that the trial court's issuance of two conflicting fresh-complaint charges to the jury constitutes plain error requiring reversal because of the clear capacity of the jury to arrive at an improper decision and, thus, an unjust result.

The instruction on the use of fresh complaint evidence by instructing the jury that "you may consider that fact and all the circumstances relating to the complaint in evaluating her credibility as the witness," could have led the jury to believe that R.I.'s conversation with Currie and A.C.'s discussion with her mother about the alleged assaults made them more believable.

We conclude that the trial court committed reversible error in its failure to declare a mistrial after properly discharging Juror Number 4. We also find reversible error in the fresh complaint charge delivered to the jury, which permitted the jury to consider the fresh complaint made in evaluating the credibility of the victims, particularly in light of the jury's read-back requests during deliberations.

\* \* \* \* \*

[At the direction of the court, per *Rule* 1:36–3, the discussion of POINT IV in the appeal has been omitted from the published version of the opinion.]

\* \* \* \* \*

Defendant's conviction is reversed and remanded for a new trial.

Reversed and remanded.