**JOEL B. DOWDYE, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2007-0067
Supreme Court of the Virgin Islands
September 14, 2011

738

739

740

JOSEPH J. MINGOLLA, ESQ., St. Thomas, USVI, *Attorney for Appellant.*

MATTHEW PHELAN, ESQ., Department of Justice, St. Thomas, USVI, *Attorney for Appellee.*

CABRET, *Associate Justice*; SWAN, *Associate Justice*; and MOORE, *Designated Justice.*[1]

## OPINION OF THE COURT

(September 14, 2011)

SWAN, J. Joel Dowdye appeals his convictions on several felonies including First Degree Murder and requests a new trial.[2] Dowdye asserts that the trial court violated his Sixth Amendment rights by: (1) conducting a lengthy *voir dire* of potential jurors concerning their membership in or their connection to the Freemasons organization, and (2) dismissing a juror from the jury panel who, during the trial, allegedly exchanged Masonic gestures or signs with Dowdye. Dowdye further asserts that the cumulative effects of both the trial court's *voir dire* on the Freemason

---

[1] Chief Justice Rhys S. Hodge is recused from this case. The Honorable Thomas K. Moore has been designated in his place pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] *See* note 3 for the crimes with which Dowdye was charged and the crimes for which Dowdye was convicted.

membership and connection issues and the dismissal of the juror who allegedly exchanged Masonic gestures or signs with Dowdye violated his Sixth Amendment rights. For the reasons elucidated below, we remand this case to the trial court for that court to conduct a limited evidentiary hearing on the issue of whether the removal of Juror Number 3 from the jury was justified.

## I. FACTS AND PROCEDURAL HISTORY

### A. Inquiry into Freemasons, Masonic Affiliations and Masonic Symbols

The facts underlying this appeal emanated from the shooting of two persons on March 25, 2006 at the Bunker Hill Guest House on St. Thomas, U.S. Virgin Islands, which resulted in the death of one of the victims. Dowdye, a police officer at the time of the shootings, was arrested for the crimes. The Virgin Islands Police Department's ("Police Department") arrest report discloses that, at the time of his arrest, Dowdye had a Masonic tattoo on his chest. (J.A. at 50.) Dowdye was charged with the shootings in an eight-count Information, which included first degree murder among the felony charges. A jury convicted Dowdye on six of the eight felonies in the Information.[3] Thereafter, the trial court sentenced Dowdye on all the convictions, which included a sentence of life imprisonment without parole for the first degree murder conviction. (*Id.* at 8-9; Sentencing Order at 7-8.)

During *voir dire*, and being mindful of the information in the Police Department's arrest report, the trial court extensively *voir dired*

---

[3] Dowdye was charged in an eight-count Information with: Count I, First Degree Murder in violation of title 14, sections 921 and 922(a)(1) of the Virgin Islands Code; Count II, Using a Dangerous Weapon During the Commission of First Degree Murder, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code; Count III, Second Degree Murder, in violation of title 14, sections 921 and 922(b) of the Virgin Islands Code; Count IV, Using a Dangerous Weapon During the Commission of Second Degree Murder, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code; Count V, Attempted First Degree Murder, in violation of title 14, sections 921 and 922(a)(1) of the Virgin Islands Code; Count VI, Using a Dangerous Weapon During the Commission of an Attempted First Degree Murder, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code; Count VII, First Degree Assault, in violation of title 14, section 295(1) of the Virgin Islands Code; and Count VIII, Using a Dangerous Weapon During the Commission of First Degree Assault, in violation of title 14, section 2251(a)(2)(B) of the Virgin Islands Code. (J.A. at 3.) The jury found Dowdye guilty of Counts I, II, V, VI, VII and VIII. (*Id.* at 7.)

prospective jurors about possible memberships in Freemason organizations and about the jurors' relationships with members of the Freemasons and other affiliated organizations.[4] The trial court stated that if "anyone in the array . . . is a member of the Free Mason [sic], the Masonry or it's also called the Masonry Lodge or the Masonic Lodge or Brotherhood of Mason[s] or the Free Masonry? . . . You have to disclose it. You have to." (J.A. at 36.) In response, Prospective Juror Number 112 answered in the affirmative, after which the trial court further inquired; "[w]ould you be able to set aside if you find out that a witness or party or something is also part of that brotherhood, will you be able to set that aside, listen to the evidence and render a decision solely on the evidence?" (*Id.*) Prospective Juror Number 112 once again answered in the affirmative. (*Id.*) Prospective Juror Number 102 volunteered that she was previously affiliated with the Pearl of the Virgin Islands Eastern Star Sisterhood. (*Id.* at 37.) When questioned about her ability to render a fair and impartial decision despite her past affiliation, Prospective Juror Number 102 answered in the affirmative. (*Id.*) No other members of the jury panel disclosed a personal affiliation with the Freemasons or the Order of the Eastern Star Organization. (*Id.* at 38.)

The trial court also inquired whether any member of the jury panel was related by blood or by marriage to anyone who might be a member of the Freemasons or other derivative organizations. (*Id.* at 38.) Prospective Juror Numbers 14, 40, 52, 99 and 126 indicated that they had relationships, ranging from being a close friend to being husbands, brothers and cousins of persons who are Freemasons, but that they would be able to render a decision based solely on the evidence. (*Id.* at 38-41.)

The trial court continued, "[n]ow, does any member of the array here now, or has ever in the past either owned or displayed any decal, bumper sticker, sign, car ornament of the Mason symbol or of any [O]rder of the Eastern Star symbols?"[5] (*Id.* at 41.) Prospective Jurors Number 11 and Number 26 indicated that a male in each of their families was or may have

---

[4] The trial court referred to the "Freemasons" by that name and by various other names which the trial court understood to be commonly used to identify the Freemasons, including; Masons, Lodge and Brotherhood. (J.A. at 42.) The trial court also identified several of the various lodges and organizations on St. Thomas believed to be affiliated with the Freemasons, namely, "the Pearl," "the Rocks" and "the Eastern Stars." (*Id.* at 38.)

[5] The trial court elaborated, "if anybody doesn't know what it is, the Marshal will display what he understands to be those symbols, in case you don't know it. But when you see it,

been a member of the Freemasons. (*Id.* at 41-42.) Prospective Juror Number 52 responded that her boyfriend wears a Freemason ring. (*Id.* at 43.) This Juror was not asked whether she could be impartial in deciding this case even though her boyfriend wears a Freemason ring. Importantly, during the *voir dire*, the parties' counsel never registered an objection to the trial court's *voir dire*. (*Id.* at 36-43.)

It is noteworthy that prospective Juror Number 41 on the jury panel became Juror Number 3 on the jury after both parties had exercised their challenges for cause and their peremptory challenges. Prospective Juror Number 41 on the jury panel, or Juror Number 3 on the jury, never responded to any of the trial court's *voir dire* questions concerning Freemasons and never asked the trial court to repeat any question asked during the *voir dire*. Likewise, Prospective Juror Number 41 never informed the trial court that he did not understand any of the questions asked during the *voir dire*. Significantly, during the *voir dire*, this juror never asked to be excused from jury duty, nor did he ask to be excused from jury duty after he became seated on the jury. Lastly, Prospective Juror Number 41 never disclosed that he is a Freemason or that he is associated with the Freemasons.

■ Even though Dowdye's counsel never objected to the *voir dire* questions, he did object to either an action or a comment by the trial court that is unspecified in the record submitted on appeal.[6] *(Id.* at 44.) Apparently, counsel for the People of the Virgin Islands ("the People")

---

you'll know it." (J. A. at 41.) The trial court then had the marshal display to the panel members what the trial court believed to be one of the Masonic symbols and one of the Eastern Star symbols. (*Id.* at 42.)

[6] Page 43 of the Joint Appendix corresponds with page 242 of the transcript of trial proceedings. Page 44 of the Joint Appendix, however, corresponds with page 297 of what appears to be a continuation of the same transcript of trial proceedings. This is one example of the carelessly assembled Record before this Court. (*See, e.g.*, J.A. at 45-46, 66-67.) The Rules of this Court explicitly require the appendix to contain a table of contents with identifying references to the sequentially numbered pages. V.I.S.CT.R. 24(a) (the appendix "*shall* include: a *table of contents* with *page references*") (emphasis added); VISCR 15(a) ("All pages of the appendix *shall be clearly and sequentially* numbered.") (emphasis added). Although the pages of the Joint Appendix are sequentially numbered, the parties' counsels have failed to include a table of contents in the Joint Appendix. The consequences for failure to adhere to the Rules of this Court are also set forth in unambiguous terms. *See, e.g.*, VISCR 20 (nonconforming documents "may be rejected by the Clerk of the Supreme Court before or after docketing."). Litigants and their counsel are admonished to comply with all rules applicable to documents filed with this Court.

745

objected to seating a juror who said that he is a Freemason. *(Id.* at 57.) Dowdye's counsel immediately objected to the striking of a juror based solely upon his membership in an organization. The following dialogue ensued between the trial court and Dowdye's trial counsel:

ATTORNEY BRUSCH: I object to that, Your Honor.

THE COURT: No, that one is okay.

ATTORNEY PAIGE: Number 112 said that he was a Mason. Number 112.

ATTORNEY BRUSCH: Your Honor, we object to that. We submit just because he is a member of an organization —

THE COURT: But the member of the organization, they said, has all kinds of secret oaths. I don't know what the oaths are.

ATTORNEY BRUSCH: I would disagree, unless you specifically ask him questions.

THE COURT: Would you like to ask him what the oaths are?

ATTORNEY BRUSCH: Note my objection, Your Honor.

. . . .

THE COURT: You think you'll get an answer?

ATTORNEY BRUSCH: Because of my organization?

THE COURT: Because of the nature of it. . . .

ATTORNEY BRUSCH: With respect to my client's rights to due process and jury trial, Your Honor —

THE COURT: If you want to disclose all what their oaths are, I'll look at it. What they are sworn to uphold, they say that's a secret. I don't know whether it's secretly supporting the process or not. Anything else, gentlemen?

ATTORNEY PAIGE: That will be it, Your Honor.

(J.A. at 44-45.)

## B. Removal of Juror Number Three

Before commencing the third day of trial, the trial court held an in-chamber conference with the parties' counsel. The trial court convened the conference because it had received a telephonic message from a man named David Cover ("Cover") on the island of St. Croix. (J.A. at 46, 56.) Cover said he was informed by someone attending the trial that a male

juror in the front row of the jury box, sitting in the second seat from the left, was exchanging Masonic signs with Dowdye in the courtroom. (*Id.* at 47.) A similar message had been conveyed to the Superior Court Marshals' Office and to the Virgin Islands Department of Justice. (*Id.* at 46.) The trial court lamented that it had done "everything [it] could with respect to *voir dire* to weed out anyone that may be a Mason, and . . . there were several disclosures." (*Id.* at 50.) The trial court explained that the *voir dire* questions regarding Freemasons were prompted by Dowdye's arrest report, which indicated that Dowdye has a Masonic tattoo on his chest, although there was no information in the arrest records that Dowdye is a Freemason. (*Id.* at 50-51.) The People's counsel informed the trial court that his office's employees had been alerted two days earlier by the brother of one of the victims, concerning the alleged exchange of Masonic signs between a juror and Dowdye. However, the People's counsel had been unable to verify that the juror was a Freemason. When Dowdye's counsel attempted to characterize the Freemasons as a thirteenth-century bricklayer's guild and objected to the relevance of such organizational membership, the trial court overruled the objection.[7] (*Id.* at 53.) Dowdye's counsel continued to object, arguing that excusing a juror solely because he is a member of an organization violates the Sixth Amendment. Dowdye's counsel vehemently denied that any signs had been exchanged between Dowdye and Juror Number 3 and further objected to any additional *voir dire* of Juror Number 3 on this issue. (*Id.* at 51, 57.) After this discussion, the trial court and both parties' counsel jointly telephoned Cover. (*Id.* at 58.) Although Cover had identified himself and provided his telephone number, Cover was adamant in refusing to identify the source of his information, who allegedly was not a Freemason, but "well acquainted with the Masonic Society." (*Id.* at 60.) Cover explained that because he was concerned about the safety of the informant, he would not divulge the informant's identity. (*Id.* at 60, 62, 65.) Because the source of Cover's information was not verified, the trial

---

[7] The trial court stated:

> I don't want to hear that. I saw everything on Discovery. They had a whole documentary on it, and it's not a secret society but a society of secrets. That's everything. Everybody says so, and that's the problem . . . . I don't know what they are secretly agreeing to among themselves. And that's why I allowed [the People] to remove anyone who said that they were a Mason . . . .

(J.A. at 53.)

court told counsel that it would be "very difficult" to act upon this information. (*Id.* at 66.) Significantly, neither Cover nor his informant submitted an affidavit or a sworn statement to the trial court concerning the alleged exchanging of Masonic signs between Dowdye and Juror Number 3. Likewise, neither of them testified under oath at a court hearing or conference on the Masonic sign issue.

The following day the trial court held another in-chamber conference prior to commencing the day's proceedings. (*Id.* at 67.) During this conference, the trial court informed the parties' counsel that the trial court would have one of its marshals sworn to testify to an incident of which the trial court had been made aware. (*Id.* at 67.) The incident occurred when the marshal who had accompanied Dowdye on his return to the Bureau of Corrections the previous day heard Dowdye say, "wait until tomorrow when they find out that he is a [M]ason." (*Id.* at 68-69.) The marshal did not question Dowdye about his statement; therefore, the marshal could not elaborate as to whom Dowdye was referring. (*Id.* at 69-70.)

After the marshal exited the chambers, the People revisited the issue of a male juror allegedly exchanging gestures or signs with Dowdye. The People's counsel stated, "I believe the [c]ourt . . . as well as the [c]ourt's law clerk observed the juror making certain motions to his face. I observed that as well on a couple of occasions." (*Id.* at 71.) The People's counsel then stated that, considering the circumstances, it would be within the trial court's sound discretion to substitute an alternate juror. (*Id.*) Dowdye's counsel objected. The People's counsel, referring to a juror's statement in *New Jersey v. Williams*, 377 N.J. Super. 130, 871 A.2d 744, 752 (N.J. Super. Ct. App. Div. 2005) revealing that the juror's Masonic oath prevented him from rendering a fair and impartial verdict, stated that "out of an abundance of caution, . . . this particular juror should be excused." (*Id.* at 73.) In ruling that Juror Number 3 would be removed from the jury, the trial court gave a detailed recitation of the facts justifying its decision, including the following personal observations it had made:

> As soon as I came out [of yesterday's in-chamber hearing], the Marshals had asked everyone to remain standing until the jurors came in. Given what had transpired, the [c]ourt focused on the male members of the jury in the first row like a laser, particularly Juror Number 3, because . . . he was the second male juror to the left.

The [c]ourt also reviewed [the juror's] questionnaire, and after seeing a documentary the week before on the Discovery [C]able [C]hannel on [F]reemasons, I subjectively believed that he fit the profile more than the other three individual males on the first row.

As the jurors were being seated, I saw Juror Number 3 make a wiping motion over his face, and then I saw him focus on [Dowdye]. Immediately I saw [Dowdye] make the exact same [wiping] motion . . . over his face and [I] looked towards Juror Number 3.

I immediately called sidebar. I told counsel what I had seen. Counsel for [Dowdye] . . . was [then] seen conferring with his client, apparently about what was said at [sidebar].

Throughout the afternoon, I observed Juror Number 3 make similar gestures by having a wiping motion over his face and then looking towards the defendant. The defendant at that time was not responding and was looking away from Juror Number 3, but Juror Number 3 continued. I also noted that Juror Number 3 focused excessively towards [Dowdye].

(J.A. at 80-82.) Objecting to the trial court's ruling, Dowdye's counsel stated that there was neither evidence that Juror Number 3 is a Freemason, nor a basis for saying that wiping one's face constitutes a Masonic sign. The trial court replied that its ruling did not rest upon whether Juror Number 3 is a Freemason, but upon whether that Juror's gesticulation, or act of making signals, indicates that "there was some contact that was unusual between [Juror Number 3] and [Dowdye.]" (*Id.* at 89.) The trial court opined that it poses a problem for the court when a juror is asked to disclose whether he is a Freemason, and he fails to do so. Dowdye's counsel argued that the trial court never determined whether the juror was untruthful during *voir dire*. Therefore, he moved the trial court for a mistrial on the grounds that, because of the trial court's reliance upon the Discovery Channel documentary and the trial court's independent investigation of Juror Number 3, the trial court had essentially become a witness against Dowdye. (*Id.* at 86, 92-93.) Despite Dowdye's objections, the trial court stated that it "exercised its discretion pursuant to" *United States v. Cameron,*[8] *Olszewski v. Spencer,*[9] and

---

[8] *United States v. Cameron,* 464 F.2d 333 (3d Cir. 1972).
[9] *Olszewski v. Spencer,* 466 F.3d 47 (1st Cir. 2006).

*State v. Williams*[10] and removed Juror Number 3, who was replaced by Alternate Juror Number 1. The trial court explicitly stated that it also relied upon *United States v. Bradley*, 173 F.3d 225 (3d Cir. 1999), for the proposition that the court "can take judicial notice of jurors in open court." (*Id.* at 88.)

After the jury found the defendant guilty on multiple felony charges, including murder, the trial court sentenced Dowdye to life imprisonment without parole on Count I; to fifteen years incarceration, with five years suspended on Count II; to twenty-five years incarceration, with five years suspended on Count V; and to fifteen years incarceration, with five years suspended on Count VI. The trial court entered its Judgment and Commitment on May 9, 2007.[11] (*Id.* at 34.) Dowdye's timely appeal ensued.[12]

## II. ISSUES

■ Dowdye propounds three issues on appeal:[13]

---

[10] *State v. Williams*, 377 N.J. Super. 130, 871 A.2d 744 (2005).

[11] The trial court also imposed fines upon Dowdye in the amount of ten thousand dollars for Count II, ten thousand dollars for Count VI and seventy-five dollars in court costs. (J.A. at 8-9.) The trial court ordered Dowdye's sentence on Count II to run consecutive to his sentence on Count I; Dowdye's sentence on Count VI to run consecutive to his sentence on Count V; and, Dowdye's sentences on Counts V and VI to run concurrently with his sentences on Counts I and II. (*Id.* at 8.) The trial court also ordered that Dowdye's sentences on Counts VII and VIII shall merge with Dowdye's sentences on Counts V and VI. (*Id.*)

[12] This Notice of Appeal was filed on May 17, 2007, following the May 9, 2007 entry of Judgment and Commitment; therefore, this appeal was timely filed. *See* VISCR 5(b)(1) ("In a criminal case, a defendant shall file the notice of appeal in the Superior Court within ten days after the entry of . . . the judgment or order appealed from.").

[13] In Dowdye's May 17, 2007 Notice of Appeal, Dowdye also questioned the sufficiency of the evidence underlying his convictions. Dowdye failed to address this issue in his November 6, 2008 Brief, or in any other filings with this Court. Supreme Court Rule 4(c) states that a notice of appeal "shall designate the judgment, order, or part thereof appealed from and the reason(s) or issue(s) to be presented on appeal." However, "an appellant [must] raise an issue in his opening brief or else waive the issue on appeal." *United States v. Hoffecker*, 530 F.3d 137, 162 (citing *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005)). Thus, issues raised in a notice of appeal but not argued in an appellant's brief are waived. *See Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 526 (3d Cir. 2003) (citing *FDIC v. Deglau*, 207 F.3d 153, 169 (3d Cir. 2000)); *see also Hoffecker*, 530 F.3d at 163 ("Inasmuch as [appellant] did not raise in his opening brief the issue[,] . . . he has waived the issue."). Dowdye, therefore, is deemed to have waived his sufficiency of the evidence claim.

A. Whether extensive *voir dire* questioning of prospective jurors concerning their affiliation with the Freemasons violated Dowdye's Sixth Amendment rights.

B. Whether the trial court's removal of Juror Number 3 violated Dowdye's Constitutional right to a fair trial.

C. Whether the cumulative effect of extensive *voir dire* questioning concerning Freemasonry and the removal of Juror Number 3 violated Dowdye's Constitutional right to a fair trial.

Even though there may be some overlapping of these issues, we will address them *seriatim* in the discussion section of this Opinion.

## III. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which grants this Court jurisdiction "over all appeals arising from final judgments, final decrees [or] final orders of the Superior Court . . . ." V.I. CODE ANN. tit. 4, § 32(a); *see also, Ritter v. People*, 51 V.I. 354, 358 (2009).

Our review of the Superior Court's application of law is *de novo, see Rranci v. Attorney General*, 540 F.3d 165, 171 (3d Cir. 2008), while findings of fact are reviewed for clear error, *Easley v. Cromartie*, 532 U.S. 234, 242, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001). We review the trial court's decision to remove a juror prior to jury deliberations for abuse of discretion. *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999).

## IV. DISCUSSION

### A. Extensive *Voir Dire* Questioning of Prospective Jurors Concerning Their Affiliation With the Freemasons Did Not Violate Dowdye's Sixth Amendment Rights

█ Although we remand this case for a hearing on other grounds, it is appropriate to address Dowdye's argument that his Sixth Amendment rights were violated by one particular line of questioning by the trial court during *voir dire*. Criminal defendants are afforded a Sixth Amendment right to trial by an impartial jury.[14] U.S. CONST. AMEND VI. The right to

---

[14] The Sixth Amendment to the United States Constitution is made applicable in the United States Virgin Islands by Section 3 of the Revised Organic Act of 1954. Revised Organic Act

be tried by an impartial jury encompasses the requirement that trial courts *voir dire* all prospective jurors to unearth potential bias and prejudice. *See* FED. R. CRIM. P. 24(a); *see also, Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991) ("*Voir dire* examination serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."); *see also, McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (one purpose of *voir dire* is to uncover "possible biases, both known and unknown, on the part of potential jurors."). Therefore, questions asked during *voir dire* must be reasonably calculated to elicit any potential bias, prejudice or preconceived opinion held by prospective jurors. *See Mu'Min*, 500 U.S. at 422. Trial courts have broad discretion in conducting *voir dire*, mitigated by basic notions of fairness. *See Davis v. Florida*, 473 U.S. 913, 915-16, 105 S. Ct. 3540, 87 L. Ed. 2d 663 (1985). For example, the Supreme Court of the United States upheld the jury's verdict in a death penalty case where all prospective jurors who expressed opposition to capital punishment were removed from the jury panel. *Witherspoon v. Illinois*, 391 U.S. 510, 514-15, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). The *Witherspoon* Court declined to declare the verdict unconstitutional. Additionally, the *Witherspoon* Court refused to conclude that this type of extensive inquiry and blanket exclusion "results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Id*. at 518.

Extensive *voir dire* has long been part of the judicial arsenal used to uncover and to eliminate juror prejudice. *See Jordan v. Lippman*, 763 F.2d 1265, 1275 (11th Cir. 1985) (recognizing that the Supreme Court of the United States in *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) presupposed the right to a searching and extensive *voir dire* where potential prejudice may stem from pre-trial publicity) (additional citations omitted). Moreover, the use of extensive *voir dire* to uncover potential juror prejudice does not *per se* violate Dowdye's Sixth Amendment right to a fair trial. Because Dowdye has not demonstrated actual prejudice emanating from the trial court's *voir dire*, we reject Dowdye's argument that his right to a fair trial was violated because of extensive *voir dire* questioning of prospective jurors about their

of 1954, § 3, 48 U.S.C. § 1561, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 86-88 (1995) (preceding V.I. CODE ANN. tit. 1)

relationships with the Freemason organization, affiliated organizations, and members of both types of organizations.

During *voir dire*, no express or explicit reference was made to Dowdye being a Freemason or to any linkage between Dowdye and the Freemasons. The trial court specifically noted that nothing in the record expressly discloses that Dowdye is a Freemason. Therefore, we cannot conclude that any connection between Dowdye and the Freemasons was communicated to the prospective jurors or "[that] the question is asked because [Dowdye] is a Mason[.]" (*See* Br. of Appellant 15.) However, because the trial court's questioning of prospective jurors about their membership in or affiliation with the Freemasons was fashioned to "elicit potential biases possessed by prospective jurors[,]" *Mu'Min*, 500 U.S. at 441 (Marshall, Blackman and Stevens, JJ., dissenting), we conclude that the trial court did not abuse its discretion by the manner in which it conducted the *voir dire*, nor by the questions it asked during the *voir dire*. Dowdye is reminded that the questioning on Freemasonry was prompted by a statement in the Police Department's arrest record that Dowdye has a Masonic sign tattooed on his chest. If the statement is true, it could support the inference that Dowdye may be an admirer of the Freemason sign or may have a Masonic affiliation.

## B. Dowdye's Right to a Fair Trial Was Violated by the Trial Court's Removal of Juror Number 3 Because the Trial Court Did Not Establish a Record that Juror Number 3 Was Unable to Perform His Jury Duties, or Disqualified from Performing His Duty as a Juror

Dowdye argues that the circumstances surrounding the removal of Juror Number 3 based upon alleged misconduct violated his Sixth Amendment right to a fair trial. Dowdye contends that the trial court erred in failing to question Juror Number 3 regarding the exchange of alleged Masonic gestures or signs between him and Juror Number 3 prior to the discharge of Juror Number 3 from the jury. Dowdye further contends that the trial court erred by not questioning Juror Number 3 about the circumstances that gave rise to the trial court's impression that Juror Number 3 was possibly a Freemason "because if [the trial court] did [question Juror Number 3] and he denied being a Mason yet again, [the trial court's] removal of him would certainly create a mistrial." (Br. of Appellant 29.) However, we are aware that when the People's counsel

suggested that a second *voir dire* of Juror Number 3 would be appropriate, Dowdye's counsel stridently and vociferously "object[ed] to any re[-]voir dire of a juror based on this ridiculous accusation," but now proffers the exact opposite argument on appeal. (*See* J.A. at 57.) Nonetheless, for the reasons expounded below, we conclude that the trial court committed plain error when it failed to, at a minimum, question or interview Juror Number 3 or conduct a hearing on Juror Number 3's possible connection or linkage to Freemasonry and the meaning of and reason for Juror Number 3's hand gestures or signs, prior to his removal from the jury.

Significantly, there is no Superior Court Rule concerning the removal of seated jurors. Title 5, section 3603(b) of the Virgin Islands Code states that "[a]ll challenges for cause or favor, whether to the array or panel or to individual jurors, shall be determined by the court." Therefore, in the absence of any local court rule, we consult the Federal Rules of Criminal Procedure[15] to determine whether the trial court improperly removed Juror Number 3. Federal Rule of Criminal Procedure, Rule 24(c)(1) provides for the removal of jurors prior to submission of the case to the jury, and Federal Rule of Criminal Procedure, Rule 23(b)(2)(B) controls the removal of jurors after jury deliberation has commenced. Therefore, Rule 24(c)(1) is applicable to this case because jury deliberations had not begun at the time Juror Number 3 was removed.[16]

■ Rule 24(c)(1) provides that "[t]he court may impanel up to 6 alternate jurors to replace any jurors who are *unable* to perform or who are *disqualified* from performing their duties." FED. R. CRIM. P. 24(c)(1) (emphasis added). The United States Court of Appeals for the Third Circuit has clarified the Rule 24(c) standard to be applied by trial courts. *United States v. Cameron*, 464 F.2d 333 (3d Cir. 1972). In concluding that the trial court did not abuse its discretion by removing and substituting a juror who had been sleeping in open court, the Third Circuit stated in *Cameron* that "the trial judge, in [its] sound discretion, may remove a juror and replace [that juror] with an alternate . . . whenever *facts are*

---

[15] The Rules of the Superior Court provide that "practice and procedure in the Superior Court shall be governed by the Rules of the Superior Court and, to the extent not inconsistent therewith, . . . the Federal Rules of Criminal Procedure[.]" SUPER. CT. R. 7.

[16] Although this case is governed by Federal Rule of Criminal Procedure 24(c)(1), we examine and apply principles from several cases that were decided pursuant to Rule 23(b)(2)(B) or similar state rules, where the significance of the case having been submitted to the jury is not implicated.

*presented* which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *Id.* at 335 (emphasis added). In another case, the Third Circuit opined that a trial court was "well within its discretion" in making the credibility determinations upon which the trial court based its decision to remove a juror who was observed engaging in "visual communication" with a defendant, *after conducting a hearing where the trial court interviewed the juror* and a marshal who witnessed the communication. *United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993) (emphasis added).

■ The trial court stated that it removed Juror Number 3 because he had not been entirely candid in responding to the questions during *voir dire* and had made improper contacts with Dowdye during the trial. Although much circumspection was taken in this case to establish a detailed and extensive record of the basis for the trial court's actions, a fatal flaw was made in the trial court's removal of Juror Number 3. The reason underlying the fatal flaw is that there was neither a proceeding to determine Juror Number 3's truthfulness during *voir dire*, nor was there a proceeding to determine Juror Number 3's ability to render an impartial verdict. Juror Number 3 was never placed under oath and asked if he is a Freemason. Juror Number 3 was never asked to explain, under oath, why he found it necessary to continuously make wiping gestures or signs across his face during the trial while simultaneously riveting his gaze on Dowdye. Juror Number 3 was never asked to explain the meaning of, or reason for, his bizarre and unconventional actions of unrelentingly wiping his face and simultaneously staring directly at Dowdye who, in turn, executed the same gestures. Juror Number 3 was never requested to expound on his highly unusual behavior of incessantly wiping his face during the proceeding and surreptitiously focusing his gaze upon Dowdye, while no other juror, including the alternates, found a need to make a similar sign or gesture during the trial. Considering the nature of the accusations against Juror Number 3, an inquiry about his conduct was warranted before his summary removal. *See id.* (upholding the trial court's decision, following a hearing, to remove a juror who was observed engaging in "visual communication . . . consisting of smiles, nods of assent, and other non-verbal interaction.").

### 1. Candor of Prospective Jurors During *Voir Dire*

■ As the basis for its removal of Juror Number 3, the trial court relied upon Juror Number 3's alleged dishonesty during *voir dire*. The

significance of prospective jurors' candor emanates from the fact that a juror's failure to honestly answer questions during *voir dire* could interfere with the ability of the parties to exercise their challenges for cause and peremptory challenges. *McDonough*, 464 U.S. at 554 ("Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."). Thus, the prejudice that may result from a juror's dishonesty during *voir dire* can adversely impact a defendant's right to a fair trial. The reason is that the juror's concealment, whether deliberate or not, may ultimately violate the defendant's Sixth Amendment right to a trial by an impartial jury. The removal of Juror Number 3 on the alleged basis that he had been deceptive or disingenuous during *voir dire* required the trial court to determine whether Dowdye suffered any bias or prejudice from the trial court's removal of Juror Number 3. Considering the facts of this case, the determination could have been made only by the trial court conducting a hearing.

### a. Circumstances When a Hearing on the Record is Not Necessary Prior to Removal of a Juror

Juror dishonesty during or following *voir dire*[17] is not always readily apparent. The trial court's obligation to question a juror to evaluate alleged dishonesty during *voir dire* is determined by whether the alleged dishonesty is readily apparent, as gauged from the nature of the alleged deception. In innumerable instances it may be unnecessary to conduct a hearing prior to removing a sitting juror when the reason for the removal is obvious to all observers. When irrefutable facts confirm a juror's inability or disqualification to serve on the jury or when such facts are readily apparent, the trial court has a sound basis for removal and it would be superfluous for the trial court to further question the juror, which would accomplish nothing but a *pro forma* investigation. *See United States v. Doerr*, 886 F.2d 944, 971 (7th Cir. 1989) (the court opined that "where the nature of the juror's inability to continue is evident to the

---

[17] A court's undertaking of this inquiry is not dependent upon whether a juror will ultimately be removed, but rather constitutes an essential part of the process to determine whether, according to the sound discretion of the court, a juror should be removed.

court, a hearing on the issue is unnecessary."); *see also, United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir. 1978) ("There must be some 'sound' basis upon which the trial judge exercised his discretion."). For example, the Third Circuit has decided a case in which the trial court discovered that one prospective juror responded to the calling of another prospective juror's name during *voir dire. United States v. Goldberg*, 330 F.2d 30, 41-43 (3d Cir. 1964), *cert. denied*, 377 U.S. 953, 84 S. Ct. 1630, 12 L. Ed. 2d 497 (1964). This error could have been readily ascertained by reviewing the record of the *voir dire* proceedings. The Third Circuit found no error in the trial court's removal and substitution of the juror solely upon the deputy clerk's discovery that the juror had responded to the wrong name. *Id.* at 43. Importantly, the facts underlying that juror's disqualification to discharge her duties were both knowable and reflected in the record irrespective of whether the trial court interviewed the juror. Consequently, in *Goldberg* the Third Circuit concluded that a sound basis for removal had been presented within the meaning of Rule 24(c) of the Federal Rules of Criminal Procedure. *Id.*; *see* FED. R. CRIM. P. 24(c). Similarly, in *United States v. Fajardo*, 787 F.2d 1523, 1525 (11th Cir. 1986), the court noted that "[a] separate hearing on a juror's incapacity is not required where the juror's inability to continue is clear[.]" The provision in Rule 24(c) for the seating of alternate jurors further supports the inference that "no finding is required when a juror manifestly *becomes* unable to perform the juror's duties, for [Rule 24(c)] expressly contemplates that possibility." *Rodriguez*, 573 F.2d at 332.

■■■ "[T]he trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever *facts are presented* which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." *Cameron*, 464 F.2d at 335 (emphasis added). The removal of a juror without a hearing may generally be done in two instances in which it is apparent that the juror's ability to perform the functions of a juror is impaired. Both a juror's physical absence from the trial proceedings and a juror's mental absence during the trial have justified the removal of a juror without a hearing. These two instances comprise perceptible facts that a trial judge can determine without a hearing.

In the case of physical absence, the United States Court of Appeals for the Fifth Circuit declined to reverse a trial judge's decision to remove a

juror who failed to return to court on the date that the jurors were instructed to return. The defendant objected to the trial judge's action on the grounds that the trial judge "failed to make inquiries as to the cause of the juror's absence[,] . . . because of the judge's failure to attempt to contact the juror by telephone or capias, or because the judge failed to hold a hearing or make a formal finding." *United States v. Rodriguez,* 573 F.2d at 332. In another case, the Third Circuit found no abuse of discretion in the removal of a juror from the panel, subsequent to admonishment but not questioning, about the juror's mental absence, when the juror was sleeping in open court. *Cameron,* 464 F.2d at 335; *see also United States v. Bradley,* 173 F.3d 225, 230 (3d Cir. 1999) ("the record shows that the court dismissed [the juror who was sleeping in open court] for her *inability* to serve as a juror, and that the court had sufficient information to support the dismissal and so did not have to voir dire her or the other jurors with respect to this point.") (emphasis in original).

### b. Circumstances When a Hearing on the Record is Necessary Prior to the Removal of a Juror

 There are instances in which a hearing is necessary before a juror can be removed. For example, in cases in which the factual basis of an alleged deception by a juror, either during or following *voir dire,* is not objectively verifiable or readily apparent, trial courts have routinely questioned the particular juror to determine whether there is a basis for removal. *See Cameron,* 464 F.2d at 334 (trial court questioned juror about greeting a key defense witness, which had been observed by defense counsel); *see, e.g., United States v. Zambito,* 315 F.2d 266, 269 (4th Cir. 1963) (juror admitted, in chambers, to having previously lied in response to questioning by the court during *voir dire*); *see, e.g., Williams,* 871 A.2d at 752 (court questioned deliberating juror who had asked to be excused because of conflicting loyalties); *see, e.g., Fajardo,* 787 F.2d at 1525 ("Where the juror's disability is less certain or obvious, however, some hearing or inquiry . . . is appropriate to the proper exercise of judicial discretion.") (internal quotations omitted); *see also, Wuest v. McKennan Hosp.,* 2000 SD 151, 619 N.W.2d 682, 690 (2000).

Additionally, some states that have a rule similar to Federal Rule of Criminal Procedure Rule 24(c) require the trial judge to conduct an inquiry of the juror on the record prior to removal of the juror. For example, the Supreme Court of Vermont held that:

Implicit in [Vermont Rule of Criminal Procedure 24(d)] is the require-ment that the court make findings on disqualification after due inquiry on the record. . . . If sanctioned as acceptable practice, *removing jurors without examination on the record would erode confidence in the jury system* as fair and impartial because it allows the appearance or pos-sibility of manipulating the jury panel membership based on an indi-vidual juror's demeanor or behavior during trial. The only way to guar-antee a defendant's right to an impartial panel is to choose that panel under rules calculated to promote fairness and then *to bar removal, except for demonstrated cause with findings on the record.*

*State v. Villeneuve*, 155 Vt. 360, 584 A.2d 1123, 1126 (1990) (emphasis added); *see also, State v. Colbert*, 990 So.2d 76, 90 (La. Ct. App. 2008) ("[A Louisiana statute] provides for the removal of jurors and replacement with alternate jurors when the original jurors 'become unable to perform or [are] disqualified from performing their duties.' When there is an allegation that a juror must be replaced, *the trial court must hold an evidentiary hearing with all parties to determine if the juror needs to be removed.*") (citations omitted and emphasis added).

 Importantly, it is "[o]nly those reasons that affect a juror's impartiality [that] can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556. In order to determine whether the essential fairness of the trial has been affected, and whether a new trial is required, the *McDonough* Court enunciated a two-part test: "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *United States v. Hodge*, 321 F.3d 429, 441 (3d Cir. 2003) (quoting *McDonough*, 464 U.S. at 556). Ultimately, when the substantial rights of a party have been affected, and "[i]f an average prospective juror would have disclosed the information, and that information would have been significant and cogent evidence of the juror's probable bias, a new trial is required to rectify the failure to disclose it." 464 U.S. at 552. (internal quotation marks and citation omitted). *In McDonough*, the underlying complaint concerned a civil dispute about a physical injury and resultant products liability claim; we are loath to apply a lesser standard to criminal actions where the defendant's liberty and constitutional rights are at issue.

### c. The *McDonough* Test Applied

In this case, the first prong of the *McDonough* test has not been satisfied. This Court cannot conclude that Juror Number 3 failed to honestly answer a material question on *voir dire* because his alleged deception is not verifiable in the record before us. Here, the first prong can only be satisfied by interviewing Juror Number 3, the members of the jury panel or the other witnesses to the alleged misconduct, concerning what they observed. Unfortunately, Juror Number 3 was never interviewed prior to his removal, nor was a hearing held prior to his removal.

The trial court's spreadsheet of prospective jurors forwarded from the trial court along with a jury panel sheet of the twelve jurors and alternate jurors is revealing. Our examination of these documents, together with the record on appeal, reveals that in response to the trial court's *voir dire*, Juror Number 3, or Prospective Juror Number 41 in the jury panel, never identified himself as a member of the Freemasons or an affiliated organization. Likewise, Juror Number 3 never identified himself as having a relationship with another person who claimed to be a Freemason, an Eastern Star or a member of an affiliated organization. Juror Number 3 never responded to any *voir dire* questions on Freemasonry. This information is significant in determining whether Juror Number 3 responded truthfully to the trial court's *voir dire* questions.

The second prong of the *McDonough* test has been satisfied in this case. All prospective jurors who admitted any affiliation with the Freemasons and related or derivative organizations were removed from the jury panel by the trial court.[18] (J.A. at 45, 54, 57.) Removal occurred even though all the prospective jurors who disclosed an affiliation with the Freemasons indicated that they would be able to render an impartial decision based solely on the evidence.

The cumulative circumstantial evidence of juror misconduct in this case is exasperating and disconcerting. Dowdye's statement prior to Juror

---

[18] The record submitted on appeal does not clearly reveal whether the venire members who were struck from the jury panel because they identified themselves as Freemasons or as having a Masonic affiliation were removed for cause or pursuant to the People's exercise of preemptory strikes. (*See* J.A. at 45, 54, 57.) At an in-chamber conference during the trial, however, the court's statement suggests that the removals were made for cause; "[w]hether you think that it was supposed to be for cause or not, they had a right to strike them for peremptory. They could have been taken off peremptorily even if I didn't do it for cause." (*Id.* at 57.)

Number 3's removal, to wit; "wait until tomorrow when they find out that he is a [M]ason[,]" strongly suggests Dowdye knew something untoward either about someone closely associated with the trial or possibly about Juror Number 3 with whom Dowdye unabashedly and continuously exchanged face wiping gestures or signs. It is noteworthy that Dowdye purportedly used the male pronoun "he" in his statement; "wait until tomorrow when they find out that *he* is a [M]ason." *See supra* Part I.B (emphasis added). If Dowdye's statement was referencing the jury panel, it explicitly eliminated from its reference all female jurors. Furthermore, it is highly unusual and more than just happenstance for a juror and a defendant, during the trial, to contemporaneously make identical wiping motions across their faces while simultaneously looking at each other. The nature of the contemporaneous face wiping motion or gestures becomes increasingly suspect when Dowdye immediately ceased making the gestures after conversing with his attorney following a sidebar conference. The attorney had returned to the defense table from a sidebar conference in which the trial court had expressed concern with the unusual face wiping behavior of both Dowdye and Juror Number 3 of wiping their faces almost in unison with each other. Juror Number 3, who could not have known what was discussed at the sidebar conference, continued to make the face wiping gesture after the sidebar conference.

 The trial court did not remove Juror Number 3 because his behavior was disruptive to the proceedings or a distraction to the trial court, to the attorneys, to the witnesses or to the other jurors. Instead, the trial court stated that Juror Number 3 "fit the profile [of a Freemason] more than the other three individual males on the first row[]" in the jury box. (J.A. at 80.) Unfortunately, the trial court provided no evidence concerning what constitutes the profile of a Freemason, what characteristics of Juror Number 3 match the profile of a Freemason or what signals, signs or gestures Freemasons may make to identify themselves or visually communicate with other Freemasons. Consequently, on the record before us, we cannot unequivocally conclude that the face wiping gesture that Juror Number 3 exchanged with Dowdye objectively demonstrates that the Juror was identifying himself as a Freemason and, therefore, had been disingenuous during the *voir dire.* Concededly, when considered in conjunction with the total record before us, Juror Number 3's face wiping conduct is extremely suspect and

761

strongly suspicious; however, more than a compelling suspicion of jury misconduct is needed to remove a juror.

■ We have no choice but to conclude that the trial court erred because, despite an extremely strong suspicion and the suspect behavior of Juror Number 3, the trial court did not conduct a hearing or interview prior to removing Juror Number 3. Because the trial court removed Juror Number 3 without first having verified crucial facts and information beyond an extremely strong suspicion to justify removal, the trial court's action cannot be justified on the basis that the removal of Juror Number 3 was a proper exercise of the trial court's discretion. *See McDonough*, 464 U.S. at 559 (Brennan and Marshall, JJ., concurring) ("The trial court in this case, however, did not reach the point of exercising discretion because it never was notified about the results of the informal examination of [the] juror[,]" which results the trial court necessarily had to consider in exercising its discretion). In this case, the trial court erred by removing Juror Number 3 without first establishing the factual basis of his disqualification or inability to discharge the requisite tasks that he had taken an oath to perform. Because "[a]ppellate tribunals are poor substitutes for trial courts for developing a record or resolving factual controversies" *id.* at 552 n.3, we will remand this case for a hearing by the trial court to determine, in accordance with the principles set forth herein, whether the removal of juror number 3 was proper. It may very well be that after the evidentiary hearing, the trial court may still conclude that it was justified in its decision to remove Juror Number 3.

### 2. Improper Juror Contact With Dowdye

■ As the basis for its removal of Juror Number 3, the trial court also relied upon the alleged improper contacts between Juror Number 3 and Dowdye. It is well established that great deference is afforded trial courts in their findings concerning juror impartiality. *See Mu'Min*, 500 U.S. at 428 (trial court "may be overturned only for manifest error" in its determinations about juror impartiality) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1994) (internal quotation marks and citation omitted)); *see also United States v. Hodge*, 321 F.3d at 440-42 (finding no abuse of discretion in trial court's refusal to grant a new trial based on juror mistakenly not disclosing that she knew defendant); *see also, United States v. Graves*, 418 F.3d 739, 743 (7th Cir. 2005) ("We grant deference to the experienced trial judge's assessment

and decision as to whether potential jurors are impartial"). However, the foundation of this deference is the requirement that an impartiality determination has first been made. *See Bradley*, 173 F.3d at 230 (unlike the trial court in this case, "the [trial] court [in *Bradley*] had sufficient information to support the dismissal and so did not have to *voir dire . . .* the . . . jurors with respect to this point.").

A trial court's determination to remove a juror who is unable to perform or who is disqualified from performing the juror's duties is reviewed for abuse of discretion. *See Cameron*, 464 F.2d at 335; *see also, Hodge*, 321 F.3d at 440. The People argue that the trial court's removal of Juror Number 3 was not an abuse of discretion because of the trial court's discretionary power to remove jurors for cause and because of the continuous face wiping gestures between Dowdye and Juror Number 3, which the trial court observed. (Br. of Appellee 21.) However, the People have ignored a crucial fact in the Juror's removal: The trial court failed to conduct a hearing to establish in the trial record the meaning of the face-wiping gesture and the basis for it, if any, to warrant the removal of Juror Number 3; therefore, the trial court did not exercise its discretion. Consequently, we disagree with the People's argument.

The trial court created an extensive record reflecting its rationale for excluding from the jury panel all Freemasons and those affiliated with the Freemasons and related organizations. The trial court established a record of why it believed that it would not be able to obtain an honest answer from prospective jurors on their ability to render an impartial verdict when they self-identified as Freemasons, members of an affiliated organization, or had a relationship with such a person. (*See, e.g.*, J.A. at 53.) ("the member[s] of the organization, they said, ha[ve] all kinds of secret oaths. I don't know what the oaths are."). However, the trial court never developed a record confirming that Juror Number 3's hand signals or face-wiping gestures were Masonic signals or signs. Likewise, the trial court failed to establish pertinent details about the nature and meaning of the purported contacts between Juror Number 3 and Dowdye to warrant Juror Number 3's removal. The trial court never established that Juror Number 3's overt conduct of making the hand signals presented a cogent basis for the trial court to independently determine Juror Number 3's disqualification or ability to perform his jury duties.

## a. Inquiry When Improper Contact Has Occurred

 "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150, 13 S. Ct. 50, 36 L. Ed. 917 (1892). The inquiry by the New Jersey trial court in *Williams* is instructive as one example of the effort trial courts must make to determine harmlessness, particularly the need to establish details about alleged juror bias, prejudice, disqualification or inability to discharge the juror's duties when the impairment is not obvious.[19] In *Williams*, the following exchange transpired between the trial court and the juror who sought to be excused:

> JUROR: Well, I'm going to ask to be excused. . . . My indoctrination in Free Mason [sic] comes with certain loyalties to other Free Masons [sic]. And I'm finding it very difficult now to make a decision one way or the other as to how I would vote. It's a serious conflict for me.
> THE COURT: I take it you are yourself a Free Mason [sic].
> JUROR: I am.
>
> . . . .
>
> THE COURT: To some extent the dilemma that you mentioned is the same that is faced by every juror.
>
> . . . .
>
> JUROR: Because of my Masonic principles I cannot find this brother, as a Free Mason [sic], guilty. That's the dilemma it [got] me in.

---

[19] This guidance is not intended to require a trial court to undertake such an inquiry where the trial court's observations are objectively verifiable from the record, for example, (1) where evidence is presented that a "wiping motion" made by a juror is a Masonic symbol, *see, e.g., United States v. Edwards*, 303 F.3d 606, 631-32 (5th Cir. 2002) (finding no clear error in removal of juror who was "lacking in candor"); (2) that the "wiping motion" is a Masonic symbol, combined with evidence about the Masonic oaths, thereby establishing the juror's inability to render a fair and impartial verdict or an act of untruthfulness during *voir dire*; or (3) any other evidence not subject to verification upon questioning by the court. Otherwise, when it appears to the trial court that juror misconduct has occurred but the juror's impairment is not evident and the basis for removal is not objectively verifiable, the trial court must hold a hearing and question the juror to determine whether a factual basis exists for concluding that the juror is incapable of carrying out his or her duties.

THE COURT: And it is because of your membership in the organization?

JUROR: Because of my oath as a Free Mason [sic].

. . . .

THE COURT: Is there any way that your adherence, your belief in your organizational principles will allow you to simply view the evidence in the case and make a judgment, make a decision in the case without taking into consideration the information that you know about [defendant] and his participation as a Free Mason [sic]?

JUROR: I don't think so. That's my dilemma right there.

THE COURT: The fact that you are aware of now that [defendant] is a Free Mason [sic], that is not something that you can put aside, that you can keep out of your mind and make your decision independent of that information?

JUROR: No, sir.

*Id.* at 753 (emphasis omitted). Upon questioning by the assistant prosecutor, the juror indicated that he had an oath of loyalty to "worthy" fellow members, stating: "[a]fter seeing a parade of witnesses, I feel he's very worthy and after viewing the other evidence, it came to be a conflict for me and that's where I'm having difficulty here." *Id.* After ascertaining that the juror was a Freemason and that the juror's swearing to a Masonic oath was the direct cause of his inability to serve or his disqualification from service as a juror, the *Williams* court determined that he was unable to uphold the oath he had sworn to as a juror and dismissed the panel member. *Id.* at 754.

### b. Inquiry When There is a Mere Suspicion That Improper Contact Has Occurred

 When there is merely a strong suspicion that improper contact has occurred with a juror, a 1954 opinion of the Supreme Court of the United States is instructive concerning how a trial court should proceed. During the early stages of trial in *Remmer v. United States (Remmer I)*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954), a third party approached one juror, allegedly in jest, and stated that the "juror could profit by bringing in a verdict favorable to [the defendant.]" *Remmer v. United States*, 205 F.2d 277, 291 (9th Cir. 1953). The juror reported this information to the trial judge who discussed it with the prosecution but not with the

defense. *Id.* The trial court had the Federal Bureau of Investigation ("FBI") investigate the incident. *Id.* The FBI ultimately issued a report to the trial court. *Id.* The defendant learned of these facts subsequent to the jury returning its verdict. *Id.* On appeal, the Supreme Court of the United States was confronted with a record detailing the lower court's private investigation into a juror's contact with a third party. The *Remmer I* Court concluded that "[t]he trial court . . . should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, *in a hearing with all interested parties permitted to participate." Remmer I*, 347 U.S. at 229-30. (emphasis added). The trial court's failure to make, on the record, proper findings concerning Juror Number 3's alleged improper contacts with Dowdye, places us in a situation similar to that reviewed by the Supreme Court of the United States in *Remmer I*. Importantly, the *Remmer I* Court succinctly stated our shared predicament: that "[w]e do not know from this record . . . what actually transpired, or whether the incidents that may have occurred were harmful or harmless." *Id.* at 229. The Court then found that "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]" *Id.*

### c. Applicable Burden of Proof

 The circumstances of juror misconduct will not support the application of a presumption of prejudice in all cases. *See Waldorf v. Shuta*, 3 F.3d 705, 711 n.6 (3d Cir. 1993). Decisions by the Supreme Court of the United States subsequent to its final decision in the *Remmer* series, and decisions by several courts of appeals, have distinguished between the applicable burden of proof in cases of jury tampering and the applicable burden of proof in cases involving other types of juror misconduct. *United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir. 1999) (collecting cases).[20] Jury tampering is generally applied to instances of misconduct of a third party, particularly "an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors." *Id.* However, juror misconduct encompasses both misconduct by a juror and other conduct that may influence the jury, but is not directly

---

[20] We do not today reach the issue of whether the presumption of prejudice standard enunciated in *Remmer I*, remains valid in cases of jury tampering.

attributable to a juror. *Compare Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) (sitting juror applied for job in the District Attorney's Office — the same office that was prosecuting the defendant), with *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (alternate jurors permitted to be present during jury deliberations).

■■■■■■ In cases involving juror misconduct, case law precedent now mandates that the appellant be afforded the opportunity to prove actual prejudice.[21] *Rushen v. Spain*, 464 U.S. 114, 119, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983); *Phillips*, 455 U.S. at 215-16; *see also, Shuta*, 3 F.3d at 710 (appellant bears the burden of proving likelihood of actual prejudice); *see also, Parker v. Head*, 244 F.3d 831, 839 n.6 (11th Cir. 2001) (collecting cases that evidence the split among the circuits). Importantly, the *Phillips* Court stated that "the remedy for allegations of juror partiality is a hearing in which the *defendant has the opportunity to prove actual bias*." *Phillips*, 455 U.S. at 215 (emphasis added).

In *Phillips*, the defendant was convicted on two counts of murder and one count of attempted murder. *Id*. at 210. The defendant appealed his convictions pursuant to a New York state statute that permitted trial courts

---

[21] We do not today reach the issue of whether the doctrine of implied bias, rather than actual bias, is the appropriate analytical approach, because there is an insufficient factual basis for us to make such a determination. *See United States v. Wood*, 299 U.S. 123, 133, 57 S. Ct. 177, 81 L. Ed. 78 (1936) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law."); *see, e.g., McCoy v. Goldston*, 652 F.2d 654 (6th Cir. 1981) (bias should be implied and a new trial granted where a juror conceals information that would have resulted in disqualification for cause). The concurring and dissenting opinions in *Phillips* posit that the majority did not abolish application of the doctrine of implied bias in appropriate circumstances. *Phillips*, 455 U.S. at 224, 235-36. Specifically, the dissent opined that application of the doctrine of implied bias was constitutionally required when "the probability of bias is particularly great, and when an evidentiary hearing is particularly unlikely to reveal that bias." *Id*. at 234 (Marshall, Brennan and Stevens, JJ., dissenting). The record before us contains strong circumstantial evidence that Juror Number 3 and Dowdye had improper contacts. The record also contains sufficient information to confirm a strong suspicion that Juror Number 3 was not completely candid during *voir dire*. However, the record is insufficient for this Court to conclude anything more. A hearing is the optimal means to determine the existence of bias or prejudice at trial where, as here: the alleged misconduct is attributable to the particular juror, not exclusively to a third party; there exists a strong suspicion that a juror and the accused had *ex parte* contact during trial; the misconduct, although in favor of the accused, could have had a detrimental effect upon either party; the juror was removed well before deliberations began; and the prosecution did not object to the removal.

to set aside or modify the verdict when, at trial, improper conduct involving a juror had occurred and when the improper conduct may have affected a substantial right of the defendant. *Id.* at 211; *see* N.Y. CRIM. PROC. LAW § 330.30. The conduct at issue in *Phillips* concerned a juror who, during the trial in which he was a sitting juror, submitted an application for the position of major felony investigator in the District Attorney's Office, which was the same office that was prosecuting the defendant. *Phillips*, 455 U.S. at 211-12. When this information was brought to the trial court's attention, a hearing was held whereupon the trial court concluded that the juror's application did not reflect the existence of any actual bias. Despite its conclusion that no actual bias existed, the United States District Court hearing the habeas corpus petition, which followed the state appeals, imputed bias to the juror because "the average man in [the juror's] position would believe that the verdict of the jury would directly affect the evaluation of his job application." *Id.* at 214. The Supreme Court of the United States reversed the application of implied bias and noted the utility of a *Remmer* hearing, stating that "[one] may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.* at 217 n.7 (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S. Ct. 519, 94 L. Ed. 734 (1950)) (internal quotation marks omitted).

 In *Rushen*, one of the witnesses at trial had been convicted of murdering a sitting juror's childhood friend. *Rushen*, 464 U.S. at 116. The juror approached the court on two separate occasions about emotional difficulties she was having due to this memory, which was triggered by seeing the witness. *Id.* The court and the juror, on both occasions, engaged in *ex parte* conversations that were neither recorded nor disclosed to either party. *Id.* Defendant's counsel learned of the conversations after the jury had returned its guilty verdict. Consequently, the defendant moved for a new trial. *Id.* The court held a hearing on the motion during which the juror testified that her memory about the murder of her childhood friend did not affect her ability to impartially decide the case. *Id.* In an appeal of the late habeas corpus proceeding, the United States Court of Appeals for the Ninth Circuit opined that the conviction had to be vacated because of the lack of a contemporaneous hearing or record concerning the *ex parte* communication. *Id.* at 118. In reversing the Ninth Circuit, the

Supreme Court of the United States wrote that "[w]hen an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties. The prejudicial effect of a failure to do so, however, can normally be determined by a post-trial hearing. The adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred." *Id.* at 119-20. Therefore, the decisions of the Supreme Court of the United States in both *Phillips* and *Rushen* indicate that the presumption of prejudice standard enunciated in *Remmer I* has since been replaced by the mandate that the criminal defendant prove actual prejudice at a *Remmer*-type hearing, even when the hearing takes place after trial. *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir. 1988).

On remand, the district court in *Remmer* held a three-day hearing where testimony from twenty-seven witnesses was heard.[22] *United States v. Remmer*, 122 F.Supp. 673, 673-74 (D. Nev. 1954). However, in making its findings the district court interpreted the Supreme Court of the United States' mandate to determine whether "the incident complained of" was harmful to mean that it investigate only one narrow aspect of the circumstances surrounding the alleged jury tampering. *Id.* at 675 (internal quotation marks omitted). Following this narrow investigation, the district court ultimately concluded that neither the verdict nor the jurors were affected by the FBI and trial court's investigation, and that no harm was suffered by the defendant. *Id.*

---

[22] The district court heard testimony from:

12 members of the jury.
2 alternates on the jury.
The person who communicated with the foreman of the jury during the trial of the case.
The Trial Judge.
The secretary to the Trial Judge.
5 government attorneys who participated in the conduct of the case.
The FBI agent, who investigated the 'incident complained of
A deputy U.S. Marshal, who, among other deputies, had charge of the jury during the trial.
The wife of the person who communicated with the foreman of the jury.
The wife of the foreman of the jury.
One of the attorneys for the defendant.

*United States v. Remmer*, 122 F. Supp. 673, 673-74 (D. Nev. 1954).

In *Remmer II* the Supreme Court of the United States granted certiorari to address the district court's narrow interpretation of its holding in *Remmer I. Remmer v. United States (Remmer II)*, 350 U.S. 377, 76 S. Ct. 425, 100 L. Ed. 435 (1956). The *Remmer II* Court clarified that it was the "paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner . . . [that] made manifest the need for a full hearing." 350 U.S. at 379-80. The *Remmer II* Court further stated that the inquiry the trial court was mandated to make was very broad in nature, requiring that

> . . . the entire picture should be explored and the incident complained of and to be examined include[s] . . . [the contact] with the juror and the impact thereof upon [the juror] then, immediately thereafter, and during the trial, taken together with [the other facts and circumstances of the trial court's handling of the misconduct.]

*Id.* at 379. In other words, "*Remmer II* requires . . . that a [trial] court, upon finding a 'reasonable possibility' of prejudice, hold a fair *hearing*." *Madrid*, 842 F.2d at 1094. The *Remmer II* Court then ordered that a new trial be held on the basis that the district court's handling of the hearing on remand had been "unduly restrictive" and that the newly available facts on appeal depicted circumstances under which none of the jurors could "say that [they were] not affected in [their] freedom of action as . . . juror[s]." *Id.* at 381-82.

 ██ In this case, no suggestion is made that Juror Number 3 was removed because he took a position inconsistent with that of the other jury members. *See Jenkins*, 861 A.2d at 835 ("A juror cannot be removed merely because she is taking a position at odds with other jurors' views."). No suggestion has been made that Juror Number 3 felt pressured by other members of the jury panel. Rather, Dowdye argues that his right to a fair trial by a jury of his peers was violated when the trial court removed Juror Number 3 allegedly because of his conduct, without first questioning Juror Number 3 concerning the same conduct. The People contend that it is evident Juror Number 3 was not impartial; consequently, the surrounding circumstances at trial and the personal observations of the trial court constituted a sufficient basis to remove Juror Number 3 for cause, and Dowdye's constitutional rights were not violated by the removal. Although pertinent, the People's argument, like the circumstances surrounding the removal of Juror Number 3, falls short of the inquiry mandated by *Remmer I* and its progeny. "[D]ue process does

not require a new trial every time a juror has been placed in a potentially compromising situation. . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in [the *Phillips*] case." *Phillips*, 455 U.S. at 217.

 "When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the [trial] court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." *United States v. Casas*, 425 F.3d 23, 48-49 (1st Cir. 2005). Despite the compelling circumstances or strong suspicion in this case, without a *Remmer* hearing to determine whether there was actual bias, the trial court lacked a basis upon which it could remove Juror Number 3 and a basis upon which it could conclude Dowdye had received a fair trial. (*See* Br. of Appellant 27.) (Dowdye's counsel objected and moved for a mistrial because the "[c]ourt ha[d] become a witness against" Dowdye and counsel could "[]not cross examine the [c]ourt."); *see also, Remmer I*, 347 U.S. at 229 ("The trial court should not decide and take final action *ex parte*[.]").

 The People assert that a trial court's "determination as to a juror's actual bias will be reversed only for a manifest abuse of discretion." (Br. of Appellee 21.) However, we emphasize that a trial court violates the abuse of discretion standard when it acts prior to "reach[ing] the point of exercising [its] discretion[.]" *See McDonough*, 464 U.S. at 559 (Brennan and Marshall, JJ., concurring). Under the present circumstances, a *Remmer* hearing is necessary to determine the existence of actual bias among the jurors at the time of trial. Further, we agree with the Supreme Court of the United States that "[i]f the hearing and determination to replace a juror during trial would have adequately protected [the accused's] right to due process of law, and would not have been rendered impossible by necessary reliance on the juror's own testimony, we see no reason why a post-trial hearing and determination would be any less protective or possible."[23] *Phillips*, 455 U.S. at 218 n.8. In *Thornton*, the Third Circuit did not disturb the trial court's refusal to initially question

---

[23] The Supreme Court of the United States rejected the Ninth Circuit's determination that a contemporaneous hearing or record of the *ex parte* communications at issue was required,

771

a juror who was observed engaging in visual communication with the defendant. Rather, the Third Circuit found no error in the trial court's decision to conduct a hearing several days later, during which the juror and a witness to the communication were questioned about the matter. *Thornton*, 1 F.3d at 154.

██ ██ Importantly, during oral argument Dowdye's counsel agreed that a remand for a post-trial hearing is a suitable remedy to address the trial court's error. Ordinarily, on remand the trial court must determine "whether the incident complained of was harmful to [the appellant], and if after a hearing it is found to have been harmful, [whether] to grant a new trial." *Remmer I*, 347 U.S. at 230. However, the circumstances before us suggest that any bias or prejudice held by Juror Number 3 could, equally conceivably, have been in favor of Dowdye. Consequently, on remand, the trial court must determine whether the removal of Juror Number 3 prejudiced the overall fairness of the trial, in addition to determining whether any harm or prejudice was caused to Dowdye.

### d. Nature of the Investigation Required on Remand

██ "The [trial] court . maintains significant discretion in determining the type of investigation required by a juror misconduct claim[.]" *Casas*, 425 F.3d at 48-49. Moreover, the "trial judge [is] in a far better position than we [are] to determine whether the alleged gestures . . . occurred, whether they appeared to be intentional or inadvertent, and whether they had any influence on witnesses or the jury." *Id.* at 47; *see also Sullivan v. Fogg*, 613 F.2d 465, 467 (2d Cir. 1980) ("a juror's statement that he remained impartial in the face of a potentially prejudicial influence is not conclusive.") (citing *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)). The trial court will be afforded much latitude on the nature of the hearing. At a minimum,

---

and explicitly stated that "the post-trial hearing . . . created more than adequate support for the conclusion that juror Fagan's presence on the jury did not prejudice [the defendant]." *Rushen*, 464 U.S. at 120. The defendant in *Rushen* was originally convicted on October 1, 1976. In *Remmer*, the defendant was convicted of income tax evasion by a jury in February 1952. The Supreme Court of the United States issued its decision remanding the case for a hearing concerning the impartiality of the juror on March 8, 1954, more than two years after the defendant was convicted. *Remmer I*, 347 U.S. at 230.

without delving into the mental processes of the jury,[24] the hearing should include: (1) trial court questioning of Juror Number 3 under oath, (2) cross-examination of Juror Number 3 by the parties' counsel, and (3) questioning of other witnesses under oath who observed or knew of the face wiping gesture or sign, all of whom will be examined by the trial court and the parties' counsel. While the trial court is granted much latitude on how the hearing is to be conducted and the types and nature of questions to allow witnesses to answer, at a minimum, Juror Number 3 must be asked whether he is a Freemason, whether his gestures during trial are Masonic signs or have any relation or significance to Freemasonry, and if not, an explanation as to why he found it necessary to continuously make the face wiping gestures while simultaneously exchanging the same gestures or signs with Dowdye. Juror Number 3 should be questioned on his reason for not responding to any *voir dire* questions about the Freemasons. Of course, if Juror Number 3 unequivocally and without compunction admits under oath that he is a Freemason or that at the time of the trial he was being considered for membership in a Masonic organization, the procedure of the hearing could change in the discretion of the trial court. *See United States v. Boscia*, 573 F.2d 827, 831 (3d Cir. 1978) ("the trial judge has some discretion in determining the nature and extent of the hearing into possible prejudicial communications.").

 Crucially, Juror Number 3 sat through the entire *voir dire* in which the trial court extensively discussed Freemasonry and other affiliated organizations. He heard the responses of other jurors to the trial court's questions on Freemasonry. Importantly, Juror Number 3 never responded to any questions on Freemasonry and never requested to be excused from jury duty. He willingly served as a juror; therefore, if he now claims a Fifth Amendment right not to answer the questions during the remand hearing, the trial court can consider such a claim in arriving at its decision. More succinctly, if Juror Number 3 refuses to answer questions

---

[24] The "mental processes of the jury" encompass those considerations that would implicate the no impeachment rule. The no impeachment rule permits "a juryman [to] testify to any facts bearing upon the question of the existence of any extraneous influence, although not . . . to how far that influence operated upon his mind or as to the motives and influences that affected the [jury's] decision." *Williams v. Price*, 343 F.3d 223, 232 (3d Cir. 2003) (quoting *Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917 (1892)) (internal quotation marks omitted).

about his association with the Freemasons or membership in a Masonic organization, if any, the trial court can consider such refusal to answer in arriving at a decision of whether Juror Number 3 should have been removed. An instruction similar to the following shall be given, if necessary, to advise Juror Number 3 of his Fifth Amendment right against self-incrimination: "it has been suggested that there is a potential that your testimony may disclose a violation of your oath of office as a juror in the case, and if that were to be true, you would potentially face possible criminal prosecution arising out of that." *Rushen*, 464 U.S. at 135 (Marshall, J., dissenting). The trial court must also inform Juror Number 3 "that [the juror] ha[s] a right not to [give self-incriminating testimony] and a right to have a lawyer present to advise [the juror] during questioning." *Id.* While the testimony of jurors is not "inherently suspect" *Corrado*, 304 F.3d 593, 603 (citing *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984)) there is "[n]othing in *Remmer I* [that] rejects the notion that sometimes courts must refuse to accept a juror's assurances of impartiality[.]" *Brooks v. Dretke*, 444 F.3d 328, 331 (5th Cir. 2006).

On remand the trial court must investigate "the circumstances of what transpired, the impact on the jurors, and whether or not it was prejudicial." *United States v. Ruiz Montes*, 628 F.3d 1183, 1187 (9th Cir. 2011). The Third Circuit approved of a *Remmer* hearing wherein the trial court (1) emptied the courtroom of all persons non-essential to the conduct of the trial; (2) had the juror state his name on the record and testify individually, while seated in the jury box; and (3) undertook a "concise and carefully worded examination [that] avoided inquiry into the content of the deliberations or the views of the juror[s]." *United States v. Boone*, 458 F.3d 321, 330 (3d Cir. 2006); *see also United States v. Corrado*, 304 F.3d 593, 604-06 (6th Cir. 2002). For these reasons, and because neither a hearing nor an interview was conducted prior to Juror Number 3's removal, we will remand this case to the trial court for a *Remmer* hearing, in accordance with the principles enunciated herein.

## C. The Issue of Whether the Cumulative Effect of Extensive *Voir Dire* Questioning Concerning Freemasonry and the Removal of Juror Number 3 Violated Dowdye's Sixth Amendment Right to a Fair Trial is Moot

Dowdye also argues that the enduring cumulative effect of the trial court's statements, questions and actions during *voir dire,* coupled with

the dismissal of Juror Number 3, deprived him of his right to a fair trial. Our holdings on the above issues essentially have rendered this argument moot. *See Cardinal Chem. Co. v. Morton Intern.*, 508 U.S. 83, 87, 113 S. Ct. 1967, 124 L. Ed. 2d 1 (1993).

## V. CONCLUSION

Considering the factual circumstances and the coincidences in the record before this Court, there is an overwhelming and compelling suspicion that there were improper contacts between Dowdye and Juror Number 3 that warrant further scrutiny and evaluation. The circumstances to justify the removal of Juror Number 3 were not subjected to a hearing to determine whether there was a basis for Juror Number 3 to be removed. Juror Number 3 was never questioned about his highly unusual conduct or his explanation for his gestures exchanged with Dowdye. Accordingly, this case will be remanded as a record remand to the Superior Court to conduct a hearing and reach a decision based on specific findings to be articulated by that court, consistent with the principles enumerated herein, as to whether Juror Number 3 was untruthful during *voir dire* when he failed to respond to any of the trial court's questions about Freemasons and whether the exchange of alleged Masonic gestures and signs of face wiping between Juror Number 3 and Dowdye during the trial justified the removal of Juror Number 3 from the jury panel.

CABRET, J., dissenting. Because I disagree with the majority's decision to remand the case for a *Remmer* hearing, I must respectfully dissent. Although I agree with the majority's conclusion that the trial judge dismissed Juror Number 3 without an adequate factual basis to believe that Juror Number 3 was a Freemason or in communication with Dowdye, I believe, for the following reasons, that this Court should order the parties to provide the full trial transcript and review the case for harmless error rather than remand the case for a *Remmer* hearing that cannot address the trial court's violation of Dowdye's right secured by Federal Rule of Criminal Procedure 24(c)(1).[1]

---

[1] Federal Rule of Criminal Procedure 24(c)(1) provides: "The court may impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties."

775

I believe that the majority opinion does not clearly set forth the test an appellate court must apply when reviewing a trial judge's decision to replace, over the defendant's objection, a sitting juror with an alternate pursuant to Rule 24(c)(1). Unfortunately, at the time this case was briefed and considered, the few appellate court decisions interpreting Rule 24(c) were also unclear as to what standard should apply, since virtually all concluded that the trial judge had not violated Rule 24(c), or implied in dicta that Rule 24(c) violations required *per se* reversal without explaining why harmless error review was not appropriate. Moreover, this Court, in its decision in *Vergile v. People*, 54 V.I. 455 (V.I. 2010), also did not fully address this issue, given our holding that the Superior Court did not violate Rule 24(c).

But on September 3, 2009 — after briefing and conference in the present case — the District of Columbia Court of Appeals, sitting *en banc*, decided *Hinton v. United States*, 979 A.2d 663 (D.C. 2009), which comprehensively summarized the history of Rule 24(c)[2] and prior case law interpreting the rule. *See id.* at 674-79. The court based its interpretation of the purpose of Rule 24(c) on the concept that a defendant has a much stronger right to have his case decided by a particular jury once that jury has been sworn into service. During the jury selection process and before the jury is sworn to try the case, a criminal defendant has no right to have any particular juror or jurors serve. Instead, the defendant is only entitled to a fair and impartial jury. *See Lambrix v. Dugger*, 529 So.2d 1110, 1112 (Fla. 1988). But once the jury has been empaneled, the defendant has a protected interest in having the chosen jury decide his or her case. *See Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949). As the United States Supreme Court explained:

---

[2] In *Hinton*, the court interpreted a local rule, Superior Court Criminal Rule 24(c), which is functionally identical to Federal Rule of Criminal Procedure 24(c). *Hinton*, 979 A.2d at 679. District of Columbia Superior Court Rule 24(c)(1) provides, in pertinent part: "The Court may empanel no more than 6 jurors in addition to the regular jury to sit as alternate jurors. An alternate juror, in the order called, shall replace a juror who, becomes or is found to be unable or disqualified to perform juror duties." Therefore, because both rules share common language and the differences between them are unimportant, the *Hinton* court turned to a comprehensive review of the history and usage of Federal Rule 24(c) to guide its interpretation of the local rule. *Id.* at 679-80.

The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That interest was described in *Wade v. Hunter* . . . as a defendant's "valued right to have his trial completed by a particular tribunal." 336 U.S., at 689. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.

*Crist v. Bretz*, 437 U.S. 28, 35-36, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978). Based on considerations of the important right which could potentially be infringed by the replacement of a sitting juror by Rule 24(c), the *Hinton* court determined that the

narrow purpose of the Rule is to enable courts to avoid mistrials by replacing incapacitated or disqualified jurors with alternates; it neither grants nor recognizes any broader removal authority, and courts have no inherent power to replace jurors for reasons other than the Rule specifies. That is how the United States Courts of Appeals have interpreted Federal Rule of Criminal Procedure 24(c) — its language grants limited authority to replace empaneled jurors and thus constrains the trial court's discretion.

*Hinton*, 979 A.2d at 679-80.

The *Hinton* court also — for the first time — set forth a complete test for reviewing preserved objections to alleged Rule 24(c) violations that harmonized pre-existing case law with the concept of harmless error review. Pursuant to *Hinton*, the appellant bears the initial burden of showing that the trial judge actually abused his or her discretion when replacing a sitting juror with an alternate during trial. *Id.* at 683-84. The trial court abuses its discretion if it replaces a sitting juror " 'without factual support or for a legally irrelevant reason.' " *Id.* at 686 (quoting *United States v. Purdy*, 144 F.3d 241, 247 (2d Cir. 1998)). If the reviewing court determines that the trial court abused its discretion, then the court must next determine whether that error was harmless, which requires the application of the "standard test applicable to non-constitutional errors." *Id.* at 690.

In this case, although I agree with the majority's conclusion that the trial court erred by failing to establish a factual basis for its determination that Juror Number 3 may have failed to honestly answer a *voir dire* question, been biased as a Freemason, or engaged in some non-verbal communication with Dowdye, the majority's reliance on the test set out in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) is misplaced. The test in *McDonough* is designed to protect a defendant's Sixth Amendment right to be tried by an impartial jury. *Id.* at 554 (impartiality as a "touchstone of a fair trial."). The question here is whether the Superior Court erred by violating the defendant's right to be tried by the *particular* unbiased jury which was originally sworn in. There is no question in this case that all twelve of the jurors who eventually decided Dowdye's case were impartial, which means *McDonough* and the aspects of the Sixth Amendment right to a jury trial it addresses are satisfied. However, this determination does not affect whether the trial court violated Dowdye's separate right under Rule 24(c) to have his case tried by the twelve jurors originally sworn in. Nevertheless, because I agree that the Superior Court made an error, I turn now to address the correct remedy for that error.

When an appellate court determines that the trial court abused its discretion, the appellant is not required to make an additional showing of prejudice to meet the harmless error inquiry, because (1) Rule 24(c), unlike other rules, does not expressly state that the appellant must prove specific prejudice; and (2) the presumption that the appellant suffered the general (or inherent) prejudice is wholly equivalent to the usual harmless error inquiry. *Hinton*, 979 A.2d at 686-87. Therefore, after holding that a trial judge violated Rule 24(c), an appellate court applies the same harmless error analysis it would apply in any other case where an error has occurred, meaning that the burden is shifted to the government to disprove the presumption of prejudice, i.e. that the error could not have had a substantial impact on the verdict. *See id.* at 690 ("Ordinarily, when this court determines that the trial court erred in a criminal case and that the error was preserved by a timely and appropriate objection, the burden is not on the appellant to show prejudice in order to obtain relief. Rather, we will grant relief — reverse the judgment on appeal — unless we are convinced the error was harmless. There are sound reasons to adhere to that general rule, and no good reason to depart from it, when the trial court has jeopardized a defendant's basic jury trial rights by erroneously

replacing an empaneled juror with an alternate in violation of Rule 24(c).")." *See also Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) (holding that an error is harmless if the record allows the appellate court to conclude "with fair assurance . . . that the judgment was not substantially swayed by the error.").

In this context, the error is harmless if the court is left with a "fair assurance" that the erroneously removed juror would have voted to convict based on the evidence presented at trial. *See Hinton*, 979 A.2d at 690-91. If there was sufficient disputed evidence, or the government's case was weak enough, that the removed juror, acting rationally, could have voted to acquit, then the " 'conviction cannot stand.' " *Id.* at 691 (quoting *Kotteakos*, 328 U.S. at 765). On the other hand, "if the government's case is strong and there is no reason apparent in the record to think the erroneously removed juror would have dissented, a reviewing court could be satisfied that the juror substitution had no substantial influence on the outcome." *Id.* at 691-92. In *Hinton*, the court noted that the defense strongly disputed much of the government's case with its own evidence, and that questions sent from the substituted juror to the court indicated that the juror might have considered the defense's case persuasive. *Id.* at 692. Therefore, because the court determined that "there is a real likelihood that [the replaced juror] would have voted to acquit Hinton, either hanging the jury or, perhaps, even persuading his fellow jurors to join him," *id.*, they reversed Hinton's conviction and remanded the case for a new trial.

I would follow the procedure outlined above to resolve this case; we already determined that the trial court violated the right protected by Rule 24(c) by dismissing Juror Number 3 without a sufficient factual basis. The next step would be to order the parties to provide us with, and then for us to review, the trial transcripts,[3] and ultimately determine whether the error was harmless. The *Remmer* hearing ordered by the majority is a fruitless examination under Rule 24(c). At this stage, we have already determined that the Superior Court violated the right protected by Rule 24(c) by dismissing a juror without an adequate factual record. The trial court's creation of an adequate factual record at a *post hoc* proceeding does not erase or mitigate its violation of Dowdye's right to have no sitting juror

---

[3] Although the parties did not include these transcripts in their joint appendix, they are nonetheless considered part of the record on appeal under our Supreme Court Rule 10.

dismissed without adequate factual support at the time of the dismissal as required by Rule 24(c). The violation has already occurred, and *post hoc* proceedings cannot change that. The only question that remains, and the one I would address, is whether that violation was harmless. Therefore, because the majority opinion fails to conduct the proper harmless error analysis and orders a remedy that cannot address the violation of Rule 24(c), I respectfully dissent.